09-4112-cv
Amnesty Int'l USA et al. v. Clapper et al.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## <u>ORDER</u>

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 21st day of September, two thousand eleven.

- - - - - - - - - - - - - - - - - - - - - -X

**AMNESTY INTERNATIONAL USA et al.,**

     <u>Plaintiffs-Appellants,</u>

     **-v.-**                  **09-4112-cv**

**JAMES R. CLAPPER, JR. et al.,**

     <u>Defendants-Appellees</u>.

- - - - - - - - - - - - - - - - - - - - - -X

**FOR APPELLANTS:**    Jameel Jaffer, American Civil Liberties Union Foundation, New York, N.Y. (Melissa Goodman and Laurence M. Schwartztol, American Civil Liberties Union Foundation, New York, NY; Christopher T. Dunn and Arthur N. Eisenburg, New York Civil Liberties Union Foundation, New York, NY; Charles S. Sims, Theodore K. Cheng, Matthew J. Morris, Proskauer Rose LLP, New York, NY)

**FOR APPELLEES:**    Douglas N. Letter and Daniel J. Lenerz, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C. (Tony West, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C.; Preet Bharara, United States Attorney for the Southern District of New York, New

York, NY, Sarah S. Normand and Serrin Turner, Assistant United States Attorneys for the Southern District of New York, New York, NY)

Following disposition of this appeal on March 21, 2011, Defendants-Appellees James R. Clapper, Jr. et al. filed a petition for rehearing in banc. A poll of the active members of the Court having been conducted, and there being no majority favoring in banc review, rehearing in banc is hereby **DENIED**.

Gerard E. Lynch, Circuit Judge, concurs by opinion in the denial of rehearing in banc.

Reena Raggi, Circuit Judge, joined by Dennis Jacobs, Chief Judge, José A. Cabranes, Richard C. Wesley, and Debra Ann Livingston, Circuit Judges, dissents by opinion from the denial of rehearing in banc.

Debra Ann Livingston, Circuit Judge, joined by Dennis Jacobs, Chief Judge, José A. Cabranes, Reena Raggi, and Richard C. Wesley, Circuit Judges, dissents by opinion from the denial of rehearing in banc.

Dennis Jacobs, Chief Judge, dissents by opinion from the denial of rehearing in banc.

Peter W. Hall, Circuit Judge, dissents by opinion from the denial of rehearing in banc.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK



GERARD E. LYNCH, *Circuit Judge*, concurring in the denial of rehearing *en banc*:

While I usually consider opinions concurring in a denial of en banc review unnecessary, I write briefly in response to my colleagues' dissents from denial of rehearing en banc because, in the absence of any panel dissent, some of their criticisms have not previously been aired. For the most part, the panel opinion speaks for itself; answers to nearly all of the dissents' points can be found there. See Amnesty Int'l USA v. Clapper, 638 F.3d 118 (2d Cir. 2011). Nevertheless, I take this opportunity to respond directly to a few points.[1]

As an initial matter, I agree with the dissenters that this case clearly satisfies Federal Rule of Appellate Procedure 35(a)(2)'s exceptional-importance requirement. And I acknowledge that it may be in some tension with opinions from other circuits (although, as discussed below, those cases are largely distinguishable from this one). But I dispute the dissenters' assertions that Amnesty somehow distorts the law of standing or, in Judge Livingston's words, "threatens a *sub silentio* transformation of this Circuit's case law." Livingston, J., Op. Dissenting from Denial of Reh'g En Banc ("Livingston, J., Op."), post at **[1]**; see also Raggi, J., Op. Dissenting from Denial of Reh'g En Banc ("Raggi, J., Op."), post at **[3]**. Standing cases are inherently fact specific, and the panel opinion takes pains to make clear that our conclusions regarding standing were limited to this statute, these plaintiffs, and the facts of this case. Furthermore, for the reasons

---

[1] As senior judges, Judges Calabresi and Sack – the other members of the panel that heard the appeal – are not eligible to participate in deciding whether to grant a petition for rehearing en banc.

articulated in the panel opinion and below, <u>Amnesty</u> fully coheres with established standing doctrine and does not represent a departure from our controlling precedents.

## I. **Summary Judgment Standard**

A theme that runs through all of the dissents is that the panel should have treated the plaintiffs' averments more skeptically. One dissent, for example, criticizes us for our overly "credulous[]" and insufficiently skeptical reading of the record. <u>See</u> Jacobs, C.J., Op. Dissenting from Denial of Reh'g En Banc ("Jacobs, C.J., Op."), <u>post</u> at **[3]**; <u>see</u> <u>also</u> Raggi, J., Op., <u>post</u> at **[22-25]**. But any "credul[ity]" displayed by the opinion reflects not any naïveté on the part of the panel, but the requirements of the procedural posture of the case. The case came to us on summary judgment, and the government expressly chose to accept the plaintiffs' allegations as true for purposes of the standing motion.[2] Thus, the panel opinion reviews the record as we are required to review it: accepting the plaintiffs' allegations as true, drawing all reasonable factual inferences in their favor, and viewing their factual assertions in the light most favorable to them. As this Court has long held, even if evidence "greatly taxes the credulity of the judge," that alone does not justify a

---

[2] <u>See</u> <u>Amnesty</u>, 638 F.3d at 129 ("The government did not submit any evidence of its own either in opposition to the plaintiff's submissions, or in support of its own summary judgment motion. Additionally, at oral argument on the summary judgment motions, the government said it accepted the factual submissions of the plaintiffs as true for purposes of those motions."); <u>id</u>. at 141 ("The plaintiffs have . . . testfi[fied] that they have altered their conduct and thereby incurred specific costs in response to the FAA. As discussed above, we must accept that undisputed testimony . . . ."); <u>see</u> <u>also</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992) (on summary judgment, evidence to support standing "will be taken to be true").

2

grant of summary judgment.  See Arnstein v. Porter, 154 F.2d 464, 469 (2d Cir. 1946) (citation omitted).

Judge Raggi points out, correctly, that where the court's subject matter jurisdiction is at issue, as in the case of constitutional standing, courts have an "'independent obligation'" to question even undisputed facts, necessary to the court's jurisdiction, that are asserted by parties.  Post at **[25]** (quoting Ariz. Christian Sch. Tuition Org., v. Winn, 131 S. Ct. 1436, 1454 (2011)).  Certainly, parties cannot confer jurisdiction on the court by stipulating to facts that are false.  But this is hardly an example of collusive stipulation to facts that, as Chief Judge Jacobs would have it, are fanciful.  See post at **[1, 5, 7]**.  As the panel opinion carefully notes, the plaintiffs' sworn testimony about their activities, and about their reasons for believing that their communications are likely to be intercepted if the government uses the authority provided by the FAA, are anything but implausible.

There is no reason to believe that the government, which vigorously contests standing, is collusively declining to challenge the plaintiffs' factual presentation in order to obtain a decision on the merits by creating an illusion of jurisdiction on the part of the court.  The court's obligation to question assertions of fact does not extend permission for judges to substitute their own beliefs – derived from their own notions about what is and is not likely to be true – about the truth of the sort of ordinary factual matters that are eminently determinable by the usual factfinding processes of the court, but that the

3

moving party (and especially the government, which has ample resources to litigate those matters) declines to challenge.

Because the plaintiffs' facts were uncontroverted, they necessarily constituted the main basis on which the panel could assess standing. There is precedent for declining to rule on standing and remanding the issue to the district court. See, e.g., Fund for Animals v. Babbitt, 89 F.3d 128, 134 (2d Cir. 1996). But in that case, the issue of standing "was neither ruled on by the district court nor fully briefed by the parties." Id. In Amnesty, by contrast, the standing issue was ruled on by the district court and fully briefed by both sides. The panel fully satisfied its "independent obligation" to assess the plaintiffs' standing.

## II.  **The Statute**

The dissenters go to great lengths to downplay the significance of the changes contained in the FISA Amendments Act ("FAA"), and to suggest that the panel somehow misinterpreted the statute's scope or operation. See, e.g., Raggi, J., Op., post at **[30-32]**.

As the panel opinion explains, the FAA indisputably and significantly broadens the risk of interception, lowers the government's probable-cause burden, and decreases the oversight role of the Foreign Intelligence Surveillance Court ("FISC"). Prior to the FAA, the government was required to identify its specific surveillance targets to the FISC. The FISC would issue a warrant only if it found there was probable cause that the target was a foreign power or an agent of a foreign power, and that the target was using or about to use the facility to be monitored. In other words, the FISC had to find probable cause for each

4

specific search, and maintained a continuing oversight role after each probable-cause determination. See Amnesty, 638 F.3d at 122-24.

The FAA significantly alters these procedures. Under Section 702 of the FAA, the FISC need only find that the government's general procedures comply with the statute's subsections and with the Fourth Amendment; the probable-cause determinations are no longer particularized. The Attorney General no longer needs to identify specific surveillance targets to the FISC. See 50 U.S.C. § 1881a(g)(4). The FAA requires him (and the Director of National Intelligence) only to provide "written certification" that targets are outside the United States. Id. § 1881a(g)(1)(A). The FISC, in order to issue a warrant, must find only that the executive's targeting procedures are "reasonably designed to" (i) ensure that any acquisition conducted under the authorization "is limited to targeting persons reasonably believed to be located outside the United States," and (ii) "prevent the intentional acquisition of any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States." Id. § 1881a(i)(2)(B). The FISC no longer considers individual surveillance applications, but rather is charged only with overseeing whether the agency has complied with FISA's general procedural requirements. Id. § 1881a(i)(2), (3)(A). The dissents make much of the FAA's requirement that the FISC determine whether the government's procedures comply with the Fourth Amendment, but, again, under the FAA that analysis is limited to the government's *general procedures*. Unlike the prior FISA regime, the FISC plays no role in reviewing the basis for any particular surveillance undertaken by

5

the government.[3]

Additionally, as the opinion explains, "[u]nder the FAA, in contrast to the preexisting FISA scheme, the FISC may not monitor compliance with the targeting and minimization procedures on an ongoing basis. Instead, that duty falls to the AG and [Director of National Intelligence], who must submit their assessments to the FISC, as well as the congressional intelligence committees and the Senate and House Judiciary Committees." Amnesty, 638 F.3d at 125 (citing 50 U.S.C. § 1881a(*l*)(1)).

The government itself admits that the FAA differs significantly from the previous version of FISA. In its petition for rehearing en banc, the government notes, for example, that "[u]nlike traditional FISA surveillance, Section 702 does not require the Government to establish individualized probable cause or to identify the specific facilities at which the acquisition will take place." Pet. for Reh'g 4. Indeed, Congress presumably would not have bothered to amend FISA if the new version of the statute were not appreciably different from the old. And as the opinion makes clear, proponents of the statute argued that it was necessary precisely because it made possible expanded surveillance that would not have been permitted under prior law. See Amnesty, 638 F.3d at 122; see also 154 Cong. Rec. H5756 (daily ed. June 20, 2008) (statement of Rep. Smith); 154 Cong. Rec. S6178-79 (daily ed. June 26, 2008) (statement of Sen. Graham). Nor did the government

---

[3] In making this point, I in no way suggest that such a specific review is constitutionally required. That is one of the issues to be addressed on the merits. The point is only that the FAA *changes* the prior regime, in a way that adversely affects the plaintiffs' situation and makes surveillance easier and therefore more likely.

ever "identify what is wrong with the plaintiffs' interpretation [of the FAA], or what a more appropriate interpretation would be. At oral argument, we asked the government to clarify what it found inaccurate in the plaintiffs' characterization, and again it failed to do so." Amnesty, 638 F.3d at 128 n.8.[4] At no point has the government explained why the plaintiffs' or the panel's characterization of the FAA is inaccurate.

## III. **Standing**

Turning to the standing analysis, it is common ground that standing requires injury in fact, causation, and redressability. The dissents seem to suggest that the opinion somehow muddles these well-established requirements, see, e.g., Livingston, J., Op., post at **[3-9]**, when in fact the opinion analyzes each element separately and in detail, see Amnesty, 638 F.3d at 131-45. The plaintiffs demonstrated present injuries in fact by "alleg[ing] . . . the expenditure of funds." Id. at 133. Their declarations – which, as discussed previously, we are bound to accept as true and which the government accepted for purposes of summary judgment – "establish[ed] that they have already incurred professional and economic costs to avoid interception." Id. The plaintiffs satisfied the causation requirement because "the professional and economic harms [they] suffered . . .

---

[4] As noted in the panel opinion, the plaintiffs alleged that under the FAA, "an acquisition order could seek, for example, '[a]ll telephone and e-mail communications to and from countries of foreign policy interest – for example, Russia, Venezuela, or Israel – including communications made to and from U.S. citizens and residents.' Moreover, the specific showing of probable cause previously required, and the requirement of judicial review of that showing, have been eliminated. The government has not directly challenged this characterization." Amnesty, 638 F.3d at 126.

7

were fairly traceable to the FAA." Id. at 134. And they demonstrated redressability because the discrete injury of which they complained – the increased likelihood of interception specifically caused by the FAA – would be relieved by a decision in their favor. See id. at 140 n.24.

The dissents also seem to misunderstand our injury analysis. The opinion addresses two different theories of injury: present injury and future injury. As to present injuries, the opinion explains that the plaintiffs' undisputed (for purposes of this motion) economic and professional harms are an injury in fact, and the same analysis that supports the conclusion that the plaintiffs' present-injury theory satisfies the causation prong *further* supports the conclusion that the plaintiffs' future-injury theory properly satisfies the injury-in-fact prong. See id. at 133-40.

Furthermore, it is emphatically not the case that, as one dissent contends, "[t]he panel opinion bases its finding of injury and causation entirely on the ethical duties of lawyers and the affidavits of the lawyer plaintiffs." Jacobs, C.J., Op., post at **[4]**. The opinion makes abundantly clear that the panel's analysis is not focused exclusively on lawyers. The plaintiffs' evidence of sensitive communications affected by the statute, cited in detail in the opinion, concerned journalists as well as lawyers, and referred to numerous categories of conversations of a sort not limited to attorneys.[5] Indeed, the panel

---

[5] See, e.g., Amnesty, 638 F.3d at 127 ("The plaintiffs' [undisputed] evidence tended to show that their work 'requires them to engage in sensitive and sometimes privileged telephone and e-mail communications with colleagues, clients, journalistic sources, witnesses, experts, foreign government officials, and victims of human rights

8

concluded that a lawyer's ethical duties and a journalist's prudent exercise of her role

brought us to the same conclusion – that is, all of the plaintiffs reasonably incurred

professional and economic costs in order to protect clients or sources.[6]

---

abuses located outside the United States.'"); id. at 127 n.11 ("Journalist Naomi Klein . . . communicates with sources abroad, including Mexican individuals regarding military activity in Chiapas, Argentinian advocates for indigenous rights, and indigenous Colombian groups who oppose U.S. trade policies. Likewise, journalist Chris Hedges, whose writing focuses on American and Middle Eastern politics and society, maintains regular contact with academics, journalists, politicians, and activists in places such as Iran, Syria, Libya, Kosovo, Bosnia, and Sudan. He also communicates with political activists and civil society leaders in Palestine, whom he believes are 'of interest' to the U.S. government."); id. at 143 ("[T]he various groups of plaintiffs – attorneys, journalists, and human rights, labor, legal, and media organizations – have established that they have legitimate interests in not being monitored."); id. ("Journalists Klein and Hedges, for example, assert that if their communications with their sources were overheard, those sources' identities, political activities, and other sensitive information would be disclosed, which would expose them to violence and retaliation by their own governments, non-state actors, and the U.S. government."); id. at 144 n.27 ("Both the attorneys and the non-attorneys have reason to fear being monitored under the challenged statute . . . .").

[6] Judge Livingston argues that these plaintiffs have suffered no actual or imminent harm. Post at [1-3]. If I simply answer, as she contends, "Not so," that is because it simply is not so. The plaintiffs have sworn that they have suffered harm, in that it has become more difficult and expensive to practice their professions as a result of the enactment of the FAA, and the government has chosen not to contest that evidence. The dissenters' argument is not that these costs have not been imposed upon the plaintiffs, but that the courts should not recognize this kind of harm as conferring standing. That argument is not unreasonable; the question is a close one. But it should not be pretended that these harms do not exist, or that the requirement that only persons with a concrete stake in the matter may seek judicial relief is violated in some unquestionable way when persons whose lives and occupations have been affected by changes in the law are permitted to raise constitutional objections to those changes. The decision to close the courthouse door to such claims is an exercise of judicial power that must stand or fall on the strength of the proffered reasons why such harm does not satisfy the purposes of the standing rule. For the reasons stated in the panel opinion, it will not do to write off the plaintiffs as simply folks who, unhappy with the Congress's resolution of the policy arguments for and against the FAA, seek to continue the political "discussion," Raggi, J.,

Next, one of the dissents submits that "any burden imposed on plaintiffs by the risk of [FAA-authorized] surveillance arose under the pre-FAA regime as well." Jacobs, C.J., Op. 7. But for the reasons already discussed, and as explained in detail in the opinion, the FAA significantly broadens the risk of interception beyond that which existed under the previous version of FISA. Furthermore, as explained in the panel opinion, because the government "accepted the factual submissions of the plaintiffs as true for purposes of [the summary judgment] motions," we "must accept the plaintiffs' evidence as undisputed explanations of how the FAA has affected them." Amnesty, 638 F.3d at 129.[7]

The dissents further contend that the plaintiffs lack standing because their asserted injuries are not redressable. See Jacobs, C.J., Op., post at **[6-8]**; Raggi, J., Op., post at **[33-38]**. But the plaintiffs' uncontroverted testimony indicated that their contacts believed they were more likely to be monitored under the FAA than under the previous

_____

Op., post at **[5 n.3]**. As the standing doctrine requires, they are people who assert that the law has specifically affected them in a way that gives them a concrete stake in the controversy, and thus a right to present their arguments (persuasive or otherwise) that the statute infringes rights conferred on them by the Constitution.

[7] See also Amnesty, 638 F.3d at 129 n.13 ("At oral argument on this appeal, the government professed itself 'puzzled' as to why the plaintiffs had not been just as nervous about being monitored before the FAA was enacted as they are now. To the extent that that statement questioned whether the plaintiffs genuinely fear being monitored after the FAA's enactment more than they did before it, the government cannot raise that challenge on appeal. . . . The time to challenge the accuracy of the plaintiffs' assertions in their declarations has passed. The government could have filed its own evidence, or sought an evidentiary hearing on the accuracy of the plaintiffs' claims, but it did neither.").

version of FISA. In their Local Rule 56.1 Statement – which, I repeat at risk of redundancy, the government declined to dispute – the plaintiffs said that "the threat of surveillance under the new law has a much greater impact on their work than previous U.S. government surveillance." Amnesty, 638 F.3d at 129 n.13 (internal quotation marks and alterations omitted). Thus, we concluded that the plaintiffs had "established that the relief they seek would redress their asserted injuries in fact, because their injuries stem from their reasonable fear of being monitored by FAA-authorized government surveillance, and if a court grants their requested relief – an injunction prohibiting the government from conducting surveillance under the FAA – the feared surveillance would no longer be permitted and therefore would, presumably, no longer be carried out." Id. at 140 n.24.[8]

---

[8] Judge Raggi appears to question whether plaintiffs can assert a Fourth Amendment right not to be surveilled, given that any surveillance authorized by the FAA would not have targeted them, rendering them mere "coincidental interceptees." Post at **[11-12]**. This seems to be a question about the *merits* of the plaintiffs' claims, rather than about their standing to make them. Plaintiffs claim that *they* have a right not to have their conversations intercepted by surveillance that is not based on specifically targeted probable cause. The merits of this claim, especially given the urgent justifications for the surveillance likely to be asserted by the government, may well be questionable. But Judge Raggi's suggestion that United States v. White, 401 U.S. 745 (1971), disqualifies "coincidental interceptees" from asserting a Fourth Amendment interest is unpersuasive. White rejected a Fourth Amendment claim by a person who voluntarily confided in an acquaintance who voluntarily recorded the conversation and reported it to the authorities. Such consensual recording is not analogous to non-consensual interception. If the mere fact that the targets of the surveillance, as non-United States persons abroad, have no right to contest electronic surveillance of their conversations entailed that no American who was overheard could object to the surveillance either, plaintiffs would not have standing even if they knew for certain they had been intercepted, and American citizens' conversations with foreigners abroad would have no protection whatsoever.

11

In addition, contrary to the dissents' contentions, see, e.g., Jacobs, C.J., Op., post at **[7-8]**, to establish redressability the plaintiffs need not show that a judgment in their favor would prevent *all* possible interception, or that they would not suffer injuries under the pre-FAA version of FISA. "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." Larson v. Valente, 456 U.S. 228, 244 n.15 (1982). Where a challenged action increases an already extant risk of harm to a plaintiff, the elimination of that action would redress the harm it causes – even if it does not eliminate the preexisting risk. Massachusetts v. EPA, 549 U.S. 497, 525-26 (2007).

The dissents also make much of the timing of the plaintiffs' challenge, pointing out that the plaintiffs filed their suit on the same day that the FAA was passed. This fact is not unusual in the context of a facial challenge, and in any event has no bearing on whether the plaintiffs could have suffered actual injury as a result of the government's use of its authority under Section 702. Indeed, there would seem to be no difference between the "reasonable likelihood" that the plaintiffs will be surveilled under the FAA on day one of the FAA's effect and the likelihood that they will be surveilled on any other day in the future.

Finally, the dissents repeatedly characterize as "speculative" the plaintiffs' assertion that their overseas contacts are likely to be government targets under the FAA. This characterization is hard to take seriously. As the opinion explains, the plaintiffs'

12

overseas contacts include, for example, alleged Al Qaeda members (and Guantanamo detainees) Khalid Sheik Mohammed and Mohammedou Ould Salahi, as well as those men's families. See Amnesty, 638 F.3d at 127 n.11. Furthermore, as discussed above, the government accepted the plaintiffs' factual submissions as true for summary judgment purposes, and never submitted evidence of its own. The plaintiffs reasonably asserted that their contacts were "likely targets of FAA surveillance," and the government never "disputed that assertion." Id. at 139.[9] The plaintiffs here, in short, have incurred present, concrete costs, because their fear of being subjected to surveillance is reasonable.[10]

## IV. Circuit Split

---

[9] Judge Raggi argues that the plaintiffs "can only speculate" about whether FAA surveillance of themselves or their foreign contacts is "certainly impending," notwithstanding that she "assumes" that the executive *will* exercise FAA authority, which, she further assumes, encompasses "dragnet surveillance." Post at **[27]**. The contradiction is palpable. How can the costs and burdens asserted by plaintiffs be denigrated as "self-inflicted," Livingston, J., Op., post at **[3]**, when it is assumed that the FAA authorizes secret "dragnet surveillance" centered on targets that these specific plaintiffs (as distinct from most Americans) have legitimate reasons to engage? Of course, given the necessarily secret nature of the interceptions authorized by the FAA, the plaintiffs almost certainly will *never* know with the certainty and specificity demanded by Judge Raggi that their conversations have been overheard as a result of FAA surveillance orders. But on the assumptions that Judge Raggi makes – which seem to me unquestionably correct – the plaintiffs have every reason to believe that such interceptions will occur, and to take costly and burdensome steps in the present if they wish to avoid that result. Their professional lives have thus been directly affected by the existence of the FAA.

[10] In contrast, the plaintiff in City of Los Angeles v. Lyons, 461 U.S. 95 (1983), could not, as Judge Raggi suggests, post at **[14]**, have given himself standing by choosing to move out of the city, precisely because he did *not* have any reasonable expectation that he would be subjected to chokehold tactics in the future.

13

Judge Raggi contends that the panel opinion creates a circuit split concerning the standards for "evaluating standing to challenge foreign intelligence surveillance programs." Raggi, J., Op., post at **[3]**; see also id. at **[27-30]**. While I concede that Amnesty is in some tension with United Presbyterian Church v. Reagan, 738 F.2d 1375 (D.C. Cir. 1984), and ACLU v. NSA, 493 F.3d 644 (6th Cir. 2007) – the two principal cases with which the dissenters argue that Amnesty creates a circuit conflict – Amnesty is nevertheless distinguishable in several ways from those cases. I will describe a few points of distinction here; the panel opinion itself provides a fuller discussion. See Amnesty, 638 F.3d at 148-49.

United Presbyterian Church concerned a "generalized challenge" to "the constitutionality of the entire national intelligence-gathering system," 738 F.2d at 1381 (internal quotation marks omitted), whereas the present case involves a specific challenge to a specific statute. Furthermore, the D.C. Circuit found that the plaintiffs' injuries were not concrete, but amounted to little more than a subjective "chilling effect." Id. at 1378-80. In the present case, by contrast, the plaintiffs have attested that they suffered concrete harms – including the expenditure of funds – and the government has not offered contrary evidence.

ACLU v. NSA is similarly distinguishable, as it involved a challenge not to specific legislation, but rather to the National Security Agency's warrantless wiretap program, which targeted individuals the government believed to be associated with Al Qaeda. 493 F.3d at 648. In the present case, by contrast, the plaintiffs challenge a statute

14

that, they argue, "permits dragnet surveillance – including surveillance directed at entire geographic areas." Appellants' Br. 48. They contend that under such a "dragnet," their communications "are far more likely to be acquired . . . than under a program of individualized surveillance that focuses solely on the communications of terrorism suspects," and that dragnet surveillance poses "far graver" consequences to them than the warrantless wiretapping posed to the plaintiffs in ACLU v. NSA. Id. Additionally, in that case, the government argued that it would not be able to address the question of standing without disclosing state secrets. ACLU v. NSA, 493 F.3d at 650. As the Amnesty plaintiffs correctly point out, in the present case "the government has not invoked the state secrets privilege and has not controverted plaintiffs' assertion that their communications are likely to be acquired under the statute." Appellants' Br. 49.

The dissents also insist that the panel opinion defies Supreme Court and Second Circuit precedents. See, e.g., Raggi, J., Op., post at **[3]** (the panel opinion is "wholly at odds with Supreme Court precedent"); Livingston, J., Op., post at **[1]** ("in frank disregard of clear Supreme Court authority"). The panel opinion articulates its reasoning in great detail and explains why our holding comports with relevant Supreme Court and Second Circuit precedent. See Amnesty, 638 F.3d at 131-49. I will therefore let those portions of the opinion speak for themselves.

\* \* \*

The critical inquiry for standing is whether the plaintiffs are simply citizens with an abstract claim that some action was unlawful, or whether they, in some particular

15

respect not shared by every person who dislikes the action, are injured by that action. Here, the plaintiffs have shown that the very existence of an expanded authority for the government to monitor electronic communications with foreigners leads them reasonably to fear that their communications will be intercepted, and that this fear inhibits their lawful activities and requires them to take costly actions to avoid such interception. The government, despite every opportunity to contest the plaintiffs' factual claims, chose to accept them as true. Nor does the government dispute that the new authority provided by the FAA expands the government's authority to wiretap and reduces judicial supervision of such surveillance.

The suggestion that the government is not certain to use that authority – which was sought and provided by Congress on the ground that it was necessary to protect the national security – is fanciful. And in any event the harm claimed by the plaintiffs is not simply that their communications may be intercepted, but that the very existence of the authority to intercept them itself causes the harm of which they complain. The plaintiffs therefore are not just people who don't like the law; they are people who reasonably contend that the law imposes a burden on them.

It is important to remember what is at stake here. The government contends, with great facial plausibility, that the law is fully consistent with the Fourth Amendment's prohibition of unreasonable searches and seizures, because the paramount necessity of protecting the nation's security against very real and dangerous external threats requires the limited additional burden on a discrete category of international communications

16

imposed by the statute.

The plaintiffs face a difficult road in persuading a court that this is not so. There are strong arguments against the plaintiffs' position on the merits, and they will be strongly made by the government as this case goes forward. In the absence of any representations by the government that addressing these questions would disclose state secrets, cf. ACLU v. NSA, 493 F.3d at 650, those arguments should be presented, and presented forcefully, to the courts. But those who would close the courthouse door to the plaintiffs do not rely on those arguments. Instead, they seek to avoid having to make them. To reject the plaintiffs' arguments not because they lack merit, but because we refuse to hear them, runs a much graver risk than whatever invasion of plaintiffs' privacy might be occasioned by the surveillance authorized by the challenged statute. The Constitution sets limits on the powers even of Congress. It is the glory of our system that even our elected leaders must defend the legality of their conduct when challenged. Short-circuiting that process risks not only that we will be governed by unconstitutional laws, but also that legitimate exercises of the lawmaking power will exist under a cloud, undispelled by the light of objective reasoning.

REENA RAGGI, Circuit Judge, with whom Chief Judge JACOBS, Judge CABRANES, Judge WESLEY, and Judge LIVINGSTON join, dissenting from the denial of rehearing en banc:

A panel of this court recognizes plaintiffs' standing to mount a facial Fourth Amendment challenge to an act of Congress that authorizes foreign intelligence surveillance subject to statutory conditions, court order, congressional supervision—and compliance with the Fourth Amendment. The panel reaches this conclusion even though plaintiffs cannot be targeted for surveillance under that statute, cannot demonstrate actual or imminent interception of any of their communications, and may in fact never experience such interception.

The panel concludes that plaintiffs' professed fear of interception under the statute is sufficient to support standing because the fear is not "irrational," and plaintiffs incurred costs to conduct conversations in person rather than risk interception. A rule that allows a plaintiff to establish standing simply by incurring costs in response to a not-irrational fear of challenged conduct is unprecedented. On that theory, every mobster's girlfriend who pays for a cab to meet with him in person rather than converse by telephone would be acting on a not-irrational fear of Title III interception and, therefore, have standing to challenge that statute.

In fact, Supreme Court precedent provides otherwise, holding that a subjective fear of challenged government conduct is insufficient to support standing, and that forbearance action can do so only when a plaintiff would otherwise certainly be subject to the challenged conduct. The panel's reduced standing standard is so at odds with this precedent as to

1

compel rejection en banc. Because this court, by an equally divided vote, declines to convene for that purpose, I respectfully dissent.

1.    Background

In 2008, Congress amended the Foreign Intelligence Surveillance Act of 1978 ("FISA") by adding § 702, which authorizes foreign intelligence surveillance of non-United States persons located outside this country consistent with the Fourth Amendment and pursuant to court order and congressional oversight. See FISA Amendments Act of 2008 ("FAA"), Pub. L. No. 110-261, § 101(a)(2), 122 Stat. 2436 (codified at 50 U.S.C. § 1881a).[1] Plaintiffs are United States persons who (1) cannot, as a matter of law, be targeted for FAA surveillance; (2) offer no evidence that their communications ever have been intercepted pursuant to the FAA; and (3) may in fact never be so intercepted. Nevertheless, they assert standing to challenge the law's facial constitutionality and to seek to enjoin all FAA surveillance based on their professed fear of coincidental interception in the course of their work-related communications with foreign contacts who might be FAA targets.

On cross-motions for summary judgment, the district court carefully reviewed Supreme Court precedent and concluded that plaintiffs lacked standing because their

---

[1] FISA defines "United States person" to mean a citizen or permanent resident of the United States; unincorporated associations, a substantial number of whose members are citizens or permanent residents of the United States; and corporations incorporated in the United States, unless qualifying as a "foreign power" under the statute. 50 U.S.C. § 1801(i).
    The FAA allows the executive to target only non-United States persons reasonably believed to be located outside this country in order to acquire foreign intelligence information. See id. § 1881a(a)-(b).

2

subjective fear of interception was too speculative to demonstrate the requisite actual or imminent injury. See Amnesty Int'l USA v. McConnell, 646 F. Supp. 2d 633 (S.D.N.Y. 2009). A panel of this court reversed, concluding that plaintiffs established standing because they sustained actual injury by incurring costs to meet with foreign contacts rather than risk interception of their electronic communications. See Amnesty Int'l USA v. Clapper, 638 F.3d 118 (2d Cir. 2011). The panel ruled that plaintiffs who incur costs to avoid feared government action have standing to challenge that action as long as their fears are not "fanciful," "irrational," or "clearly unreasonable." Id. at 133, 135. The panel concluded that plaintiffs satisfied this standard because their fears of interception "are based on a reasonable interpretation of the challenged statute and a realistic understanding of the world." Id. at 139.

This analysis pronounces a novel, relaxed standing standard wholly at odds with Supreme Court precedent. Further, the adoption of such a standard creates a split between this court and our sister circuits in evaluating standing to challenge foreign intelligence surveillance programs. See Al-Haramain Islamic Found., Inc. v. Bush, 507 F.3d 1190, 1205 (9th Cir. 2007); ACLU v. NSA, 493 F.3d 644, 656 (6th Cir. 2007); United Presbyterian Church v. Reagan, 738 F.2d 1375, 1380 (D.C. Cir. 1984) (Scalia, J.). No member of the court here disputes the "exceptional importance" of these concerns. Fed. R. App. P. 35(a)(2). Meanwhile, a significant number views the panel decision as fundamentally flawed for reasons discussed in detail in this opinion.[2] Nevertheless, with little more than a token

---

[2] Further reasons for concern are discussed in opinions filed today by Chief Judge Jacobs and Judge Livingston.

response from the author of the panel opinion, the court refuses to rehear the case en banc. I respectfully dissent from that decision.

2.    The Nature of Plaintiffs' Claim Warrants Particular Attention in Assessing Standing

The panel's novel conclusion—that self-incurred costs can establish standing whenever occasioned by a not-irrational fear of being affected by challenged government conduct—would warrant en banc review in any case. This, however, is hardly "any case." Three features merit mention before discussing the panel's general failure to follow Supreme Court standing precedent.

First, plaintiffs sue to strike down an act of Congress. That circumstance, by itself, demands an "especially rigorous" standing inquiry. Raines v. Byrd, 521 U.S. 811, 819-20 (1997). The rigorous inquiry requirement derives from the Constitution's separation of powers and serves to maintain the proper balance between the least and most democratic branches of the federal government. See Arizona Christian Sch. Tuition Org. v. Winn, 131 S. Ct. 1436, 1441-42 (2011) (observing that "[f]or the federal courts to decide questions of law arising outside of cases and controversies would be inimical to the Constitution's democratic character"); Valley Forge Christian Coll. v. Americans United For Separation of Church & State, Inc., 454 U.S. 464, 471 (1982) (recognizing that federal courts do not wield an "unconditioned authority to determine the constitutionality of legislative or executive acts"); see also Livingston, J., Op. Dissenting from Denial of Reh'g En Banc ("Livingston, J., Op."), post at **[11-12]**. Thus, while a court should not hesitate to recognize standing to challenge federal law where rigorous inquiry demonstrates it exists, a court cannot excuse

4

a party from that rigorous inquiry simply by proclaiming it "the glory of our system that even our elected leaders must defend the legality of their conduct when challenged." Lynch, J., Op. Concurring in Denial of Reh'g En Banc ("Lynch, J., Op."), ante at **[17-18]**.[3]

Second, plaintiffs cannot themselves be targets of the statute they seek to invalidate. That fact requires them to make a "much more" convincing showing of standing than would be demanded of a target. Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992) (stating that it is ordinarily "substantially more difficult" to establish standing to challenge government action that targets someone else (internal quotation marks omitted)). The

---

[3] The pronouncement is not quite accurate. To be sure, elected leaders must "defend" their conduct—lawful or not—at the ballot box at regular intervals. But they need not defend it in court "when[ever] challenged." Lynch, J., Op., ante at **[18]**. Rather, they must do so only when the challenging party can demonstrate an actual or imminent personal injury caused by that conduct. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 575 (1992) (observing that injury element of standing requires more than "alleged violation of a right to have the Government act in accordance with law"). It is this standing issue that half of the active members of the court wish to discuss further en banc, and Judge Lynch cannot justify the court's denial of that discussion by charging us with fear of another, i.e., the merits of plaintiffs' claim. See Lynch, J., Op., post at **[17]**. Much less can he insinuate that we in the dissent are somehow less sensitive than he to the judiciary's proper role in reviewing constitutional challenges to acts of Congress. Indeed, it was Chief Justice Marshall—a jurist with no crabbed view of the judiciary's role or fear of legal discussion—who cautioned that if judicial power were "extended to every question under the constitution," federal courts might take possession of "almost every subject proper for legislative discussion and decision," a result unwarranted in a democratic republic. 4 Papers of John Marshall 95 ©. Cullen ed. 1984) (quoted in DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006)). Mindful of this admonition, the Supreme Court has long been careful to observe the "role assigned to the judiciary" within the Constitution's "tripartite allocation of power." Flast v. Cohen, 392 U.S. 83, 95 (1968). Consistent with that role, when a party whose opposition to legislation has failed to carry the day in congressional debate seeks to revive the "discussion" in the courts, the law quite reasonably demands a rigorous inquiry into standing, requiring the party to demonstrate that he is not simply disgruntled, but actually injured by the law he challenges.

requirement is based on a prudential concern with ensuring that a party who wishes to use the courts rather than the public square to attack legislation asserts his own concrete claim of injury rather than those of third parties. See Warth v. Seldin, 422 U.S. 490, 499 (1975). This prudential rule "frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." United States v. Raines, 362 U.S. 17, 22 (1960).

This last point assumes greater significance in light of a third feature of the case: the nature and source of the personal right asserted by plaintiffs are unclear. "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted." Warth v. Seldin, 422 U.S. at 500 (internal citation omitted). In short, to determine whether a party satisfies the injury prong of standing, a court must understand what "legally protected interest" has been invaded. Lujan v. Defenders of Wildlife, 504 U.S. at 560. The question requires particular attention when, as here, Fourth Amendment rights are asserted. See generally Rakas v. Illinois, 439 U.S. 128, 138-41 (1978) (recognizing that identification of standing and substantive Fourth Amendment rights are "intertwined").[4]

Plaintiffs submit that the FAA is unconstitutional on its face for authorizing

_____

[4] The question of whether a plaintiff asserts a cognizable legal interest is closely related but not identical to the question of whether a plaintiff's particular assertion of a cognizable interest is meritorious. Thus, the concerns detailed in the ensuing discussion, which receive no mention by the panel, cannot be dismissed as pertaining only to "the merits of the plaintiffs' claim, rather than . . . their standing." Lynch, J., Op., ante at **[11 n.8]** (emphasis in original).

6

surveillance that violates the Fourth Amendment.[5]  The claim is curious because, on its face,

the FAA makes plain that any surveillance under that statute must be conducted consistent

with the Fourth Amendment.   This is reflected in no less than three provisions: (1)

§ 1881a(b)(5), which mandates that FAA surveillance "shall be conducted in a manner

consistent with the fourth amendment to the Constitution of the United States"; (2)

§ 1881a(g)(2)(A)(iv), which requires the executive to certify to the Foreign Intelligence

Surveillance Court ("FISA court") that the procedures and guidelines it has adopted to satisfy

FAA targeting and minimization requirements "are consistent with the requirements of the

---

[5] Insofar as plaintiffs also challenge the FAA on First Amendment grounds, that claim appears to be derivative of the charged Fourth Amendment violation: "The challenged law violates the First Amendment by substantially burdening a broad range of lawful expressive activity without adequate justification and by authorizing defendants to acquire constitutionally protected communications without meaningful judicial oversight." Compl. ¶ 105 (emphasis added). See ACLU v. NSA, 493 F.3d at 657 (Batchelder, J.) (observing that plaintiffs who challenged warrantless NSA surveillance program on various constitutional grounds "have only one claim, namely, breach of privacy, based on a purported violation of the Fourth Amendment or FISA"). This makes sense. Journalists investigating organized crime would hardly be heard to complain that Title III surveillance, lawful under the Fourth Amendment, see, e.g., United States v. Tortorello, 480 F.2d 764, 771-75 (2d Cir. 1973), nevertheless violates the First Amendment by burdening their ability to communicate electronically with likely mob targets who could give them insights into La Cosa Nostra, see generally United States v. Mayer, 503 F.3d 740, 750 (9th Cir. 2007) (explaining that undercover surveillance lawful under Fourth Amendment does not violate First Amendment rights); ACLU Found. of S. Cal. v. Barr, 952 F.2d 457, 471 (D.C. Cir. 1991) (same in context of FISA surveillance); Gordon v. Warren Consol. Bd. of Educ., 706 F.2d 778, 781 n.3 (6th Cir. 1983) (observing that "[c]ourts have recognized that physical surveillance consistent with Fourth Amendment protections in connection with a good faith law enforcement investigation does not violate First Amendment rights" and collecting cases); see also Zurcher v. Stanford Daily, 436 U.S. 547, 564 (1978) (requiring only that Fourth Amendment be applied with "scrupulous exactitude" where First Amendment interests are implicated in search (internal quotation marks omitted)).

7

fourth amendment to the Constitution of the United States"; and (3) § 1881a(i)(3)(A), which conditions the requisite court order on a judicial finding that the executive's targeting and minimization procedures "are consistent . . . with the fourth amendment to the Constitution of the United States." See 154 Cong. Rec. S6388 (daily ed. July 8, 2008) (statement of Sen. Bond, then-Vice Chairman, S. Select Comm. on Intelligence) (describing Fourth Amendment compliance as "overarching mandate" of FAA).

In the absence of any evidence of actual surveillance practices under the FAA, a court cannot assume that the executive and the judiciary will flout these statutory requirements or misconstrue Fourth Amendment protections. Indeed, the presumption is to the contrary. See United States v. Chem. Found., Inc., 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); see also Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 618 (2007) (Kennedy, J., concurring) ("Government officials must make a conscious decision to obey the Constitution whether or not their acts can be challenged in a court of law and then must conform their actions to these principled determinations."). Thus, how can these plaintiffs claim—in a lawsuit filed the very day the FAA became law—that a statute to which they are not even subject, on its face, puts them at risk of any Fourth Amendment injury? See Lujan v. Defenders of Wildlife, 504 U.S. at 569 n.4 (requiring standing to be determined "on the facts as they existed when the complaint [was] filed" (internal quotation marks and emphasis

8

omitted)).[6] In the context of such a curious claim, the concerns raised by the panel's decision to lower plaintiffs' constitutional standing burden are heightened by those "prudential principles" whereby the judiciary seeks (1) "to avoid deciding questions of broad social import where no individual rights would be vindicated" and (2) "to limit access to the federal courts to those litigants best suited to assert a particular claim." Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 99-100 (1979); see Warth v. Seldin, 422 U.S. at 499 (discussing how prudential concerns supplement constitutional elements of standing).

What individual Fourth Amendment right do plaintiffs seek to vindicate by this facial challenge? The question admits no easy answer. Plaintiffs assert that the FAA "authorizes defendants to acquire the constitutionally protected communications of U.S. citizens and residents"—presumably themselves—without requiring identification of "the people to be surveilled" and the facilities to be monitored in "individualized warrants based on criminal or foreign intelligence probable cause." Compl. ¶ 104. But as United States persons, plaintiffs cannot be "the people to be surveilled" under the FAA; if intercepted at all, it could only be as coincidental communicants of FAA targets. Coincidental interceptees, however, cannot claim a personal Fourth Amendment right to be identified or to have probable cause

---

[6] Judge Lynch submits that it is not unusual for facial challenges to be filed on the date of a statute's enactment. See Lynch, J., Op., ante at **[12]**. This misses the point. It is certainly unusual to file such a challenge to a statute that, on its face, requires compliance with the very constitutional provision that plaintiffs claim will be violated by every application of the law. See generally Sabri v. United States, 541 U.S. 600, 609 (2004) (noting that facial challenge "in the strictest sense" is one claiming that "no application of the statute could be constitutional" (emphasis added)).

9

established as to themselves as a precondition to reasonable surveillance. Cf. United States v. Figueroa, 757 F.2d 466, 472 (2d Cir. 1985) (holding that Title III "order which does not specify every person whose conversations may be intercepted does not per se amount to a 'virtual general warrant' in violation of the fourth amendment" (quoting United States v. Kahn, 415 U.S. 143, 154 (1974)); United States v. Tortorello, 480 F.2d 764, 775 (2d Cir. 1973) (rejecting argument that government must establish probable cause as to all interceptees: "If probable cause has been shown as to one such participant, the statements of the other participants may be intercepted if pertinent to the investigation.").

Alternatively, plaintiffs might be understood to challenge the FAA for failing to require individualized warrants, particularity, or probable cause with respect to foreign targets. But a non-target's personal right to challenge the lawfulness of surveillance of a third party usually arises only upon the non-target's actual interception in the course of such surveillance, which plaintiffs do not allege here. See generally United States v. Fury, 554 F.2d 522, 526 (2d Cir. 1977). In any event, because FAA targets must be non-United States persons outside this country, they lack the very Fourth Amendment rights with respect to foreign intelligence surveillance that plaintiffs claim on their behalf. See United States v. Verdugo-Urquidez, 494 U.S. 259, 274 (1990) (holding that foreign persons outside the United States cannot claim Fourth Amendment protections); accord In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 157, 168-69 (2d Cir. 2008).[7] This gives rise to a

_____

[7] Thus, even if plaintiffs' hearsay assertion that their foreign contacts "believed they were more likely to be monitored under the FAA" is "uncontroverted," Lynch, J., Op., ante

10

question that plaintiffs do not address and for which no answer can be found either in the panel opinion or Judge Lynch's concurrence: Under what, if any, circumstances can a coincidental interceptee claim a personal Fourth Amendment right to challenge foreign intelligence surveillance that is lawful as to its target? In other contexts in which warrantless interceptions are lawful as to one party, coincidental interceptees have not been found to have a distinct Fourth Amendment right. See generally United States v. White, 401 U.S. 745, 751-53 (1971) (holding that conversation recorded on consent of one participant did not violate other participant's Fourth Amendment rights).[8]

If, like the district court, the panel had concluded that plaintiffs lacked standing regardless of the nature of their claims because they failed to show actual or imminent injury from FAA interception, there would, of course, have been no need to pursue this matter. But I question how, consistent with "the province of the court . . . to decide on the rights of individuals," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803), the panel could recognize plaintiffs' standing without a clearer comprehension of the personal Fourth Amendment right at stake, see Warth v. Seldin, 422 U.S. at 500.

Further, without such an understanding, it is impossible to conclude that these

---

at **[11]**, that belief is irrelevant to identifying the personal constitutional right that plaintiffs seek to vindicate through this action.

[8] It is no answer to state that "consensual recording is not analogous to non-consensual interception." Lynch, J., Op., ante at **[11 n.8]**. The question, which is only illustrated by White, is whether in any circumstance where warrantless interceptions are lawful as to one party, the law recognizes coincidental interceptees to have a distinct Fourth Amendment right to challenge the surveillance.

11

plaintiffs are the persons "best suited" to challenge the constitutionality of a statute that cannot target them. Gladstone Realtors v. Vill. of Bellwood, 441 U.S. at 100. Indeed, a contrary inference might be drawn from the fact that, in the FAA, Congress expressly conferred standing on electronic communication service providers to challenge directives requiring them to provide technical assistance to effect authorized surveillance. See 50 U.S.C. § 1881a(h)(4). Service providers' willingness to avail themselves of such standing is evidenced by the Fourth Amendment challenge one such provider filed to surveillance under the FAA's predecessor statute, the Protect America Act of 2007 ("PAA"), Pub. L. No. 110-55, 121 Stat. 552. See In re Directives Pursuant to Section 105B of the Foreign Intelligence Surveillance Act (In re FISA Section 105B Directives), 551 F.3d 1004 (FISA Ct. Rev. 2008) (discussed further infra at [27-28]). In addition, the law recognizes any person's standing to challenge the legality of FISA-acquired evidence that is offered against him in a criminal prosecution. See, e.g., United States v. Abu-Jihaad, 630 F.3d 102, 107-31 (2d Cir. 2010), cert. denied, 131 S. Ct. 3062 (June 27, 2011); see also 50 U.S.C. § 1806© (requiring government to notify interceptee of intent to disclose or use information derived from electronic surveillance); id. § 1806(e) (permitting interceptee to move to suppress information derived from electronic surveillance as unlawfully acquired); id. § 1881e(a) (subjecting information derived from FAA surveillance to provisions of § 1806). Thus, a relaxed inquiry into plaintiffs' standing cannot be justified on the ground that no one else will be able to challenge FAA surveillance. In any event, the Supreme Court has expressly rejected such an argument as a ground for recognizing standing. See Schlesinger v.

12

Reservists Comm. to Stop the War, 418 U.S. 208, 227 (1974) (citing United States v. Richardson, 418 U.S. 166, 179 (1974)); accord ACLU v. NSA, 493 F.3d at 675-76 (Batchelder, J.).

Mindful of the heightened scrutiny and prudential concerns triggered by these particular aspects of plaintiffs' claim, I turn to the even more serious matter of the panel's failure to follow Supreme Court standing precedent.

3.    The Panel Decision Puts this Court at Odds with Supreme Court Precedent

Most disturbing about the court's decision not to convene en banc is that it thereby allows a novel, reduced standing standard, at odds with Supreme Court precedent, to become citable as the law of this circuit.[9]

To establish standing on summary judgment, plaintiffs were required to demonstrate three elements that constitute the "irreducible constitutional minimum" for standing: (1) an injury in fact, i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) a causal connection, i.e., "the injury has to be fairly traceable to the challenged action of the defendant"; and (3) redressability, i.e., "it must be likely, as opposed to merely speculative,

---

[9] Judge Lynch submits that en banc review is unnecessary because the panel's "conclusions regarding standing were limited to this statute, these plaintiffs, and the facts of this case." Lynch, J., Op., ante at **[1]**. Would it were so. Standing determinations may be "fact specific," but "standing concepts," i.e., the governing legal principles, gain "considerable definition from developing case law." Allen v. Wright, 468 U.S. 737, 751 (1984). Thus, because the flawed "standing concept" developed by the panel in this case might be read to bind future panels, it merits en banc review.

13

that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. at 560-61 (internal citations, quotation marks, and alterations omitted).

The obvious concrete injury to be expected from unlawful electronic surveillance is interception. Plaintiffs, however, offer no evidence that they have ever actually been intercepted by FAA surveillance. Nor have they established that any such interception is "imminent," a term that the Supreme Court construes to mean "certainly impending." Id. at 564 n.2 (emphasis in original; internal quotation marks omitted); see also Summers v. Earth Island Inst., 555 U.S. 488, 129 S. Ct. 1142, 1152-53 (2009) (refusing to dilute strict imminence requirement to demand only "realistic threat that reoccurrence of the challenged activity would cause the plaintiff harm in the reasonably near future" (emphasis in original; internal quotation marks and brackets omitted)).

Instead, plaintiffs profess only a fear of FAA interception, which is plainly insufficient to establish standing. See City of Los Angeles v. Lyons, 461 U.S. 95, 107 & n.8 (1983) (holding that subjective fear of police misconduct, even when grounded in past injury, is not enough to demonstrate imminent threat: "It is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." (emphasis in original)). Rather than follow this precedent to its inevitable conclusion—dismissal of plaintiffs' claim for lack of standing—the panel asserts that it "overstates" the standing standard to require plaintiffs to demonstrate that it is "effectively certain" that they will be intercepted on FAA surveillance. Amnesty Int'l USA v. Clapper, 638 F.3d at 135.

How does the panel elide the precise future-injury standard—"certainly

14

impending"—articulated in Lujan? By reasoning that, in lieu of injury inflicted by the government through actual or imminent FAA interception, plaintiffs can establish standing through self-inflicted injury, specifically, costs incurred to meet with foreign contacts rather than risk feared FAA interception. The panel concludes that with actual injury thus established, the likelihood of interception becomes relevant only to causation, i.e., were the incurred costs "fairly traceable" to the FAA? Id. As to this requirement, the panel uses a purported admonition to set a very low bar—"If the possibility of interception is remote or fanciful, [plaintiffs'] present-injury theory fails because [they] would have no reasonable basis for fearing interception under the FAA, and they cannot bootstrap their way into standing by unreasonably incurring costs to avoid a merely speculative or highly unlikely potential harm," id. at 133-34—which is then applied to identify a claim for future injury as well. See Lynch, J., Op., ante at **[8]** (observing that "the same analysis that supports the conclusion that the plaintiffs' present-injury theory satisfies the causation prong further supports the conclusion that the plaintiffs' future-injury theory properly satisfies the injury-in-fact prong" (emphasis in original)).[10]

Thus, for the price of a plane ticket, plaintiffs can transform their standing burden from one requiring a showing of actual or imminent FAA interception to one requiring a showing that their subjective fear of such interception is not "fanciful," "irrational," or

---

[10] Judge Livingston's opinion discusses in detail the concerns raised by the panel's identification of standing based on a theory of future injury. See Livingston, J., Op., post at **[4-11]**.

15

"clearly unreasonable." Id. at 133, 135. Had the idea only occurred to the plaintiff in City

of Los Angeles v. Lyons, 461 U.S. 95, he presumably could have avoided the need to show

an actual or imminent risk of being subjected to the challenged police chokehold procedure

simply by moving from Los Angeles to Glendale, and then claiming that the actual injury of

his moving costs was "fairly traceable" to a not-irrational fear of a procedure to which he,

after all, had already been subjected.[11]

I doubt that the Supreme Court would have found such an argument convincing in

Lyons for the same reason it fails to persuade here. Plaintiffs' costs—to the extent any were

even demonstrated, see infra at **[23-24]**—are fairly attributed not to the FAA but to their own

subjective fear of FAA interception, which they claim has chilled their normal exchange of

international communications. The Supreme Court has ruled that such subjective chilling

---

[11] Judge Lynch states that Lyons, unlike plaintiffs here, "did not have any reasonable expectation" that he would be subjected in the future to the chokehold procedure he sought to enjoin. Lynch, J., Op., ante at **[14 n.10]**. That is Judge Lynch's conclusion, not the Supreme Court's, which found standing lacking not because Lyons' expectations were not "reasonable" but because they were not certain. See City of Los Angeles v. Lyons, 461 U.S. at 106 (holding that for Lyons to establish standing he had to allege that he would have another encounter with the police and that "all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter" (emphasis in original)). This court cannot reduce the "certainly impending" injury requirement for standing to one of reasonableness by pointing to plaintiffs' self-incurred costs. To do so misreads Lyons and contravenes the holdings in Lujan v. Defenders of Wildlife, 504 U.S. at 564 n.2, and Summers v. Earth Island Inst., 129 S. Ct. at 1152-53. Rather than respond to this and other concerns with how far the panel decision departs from Supreme Court precedent, Judge Lynch dismissively asserts that the dissenters "seem to misunderstand" the panel's "injury analysis." Lynch, J., Op., ante at **[8]**. The wish appears to be father to the thought. I fear we understand the panel's analysis all too well, and recognize that it puts this circuit directly at odds with binding Supreme Court precedent.

16

cannot support standing. See Laird v. Tatum, 408 U.S. 1, 10 (1972) (holding that plaintiff "who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity" lacks standing to invoke federal jurisdiction). Applying Laird to plaintiffs' case, the district court explained:

> What made the chilling effect subjective in Laird was the plaintiffs' failure to show that they were subject to the challenged policy and faced a threat of harm from it. The plaintiffs could only show that the surveillance policy existed. The plaintiffs' failure to substantiate the alleged chill with proof that they really were subject to the information gathering policy made their alleged chill "subjective." See Ozonoff v. Berzak, 744 F.2d 224, 229 (1st Cir. 1984) (Breyer, J.) (interpreting phrase "without more" in Laird to mean that "[t]he plaintiffs in Laird did not claim that the information gathering activities were directed against them specifically or that the gathered data could be directly used against them in any foreseeable way"). All of the plaintiffs' alleged "objective" expenditures are insufficient to establish standing because they all arise from the plaintiffs' choices to incur expenditures and costs that are not based on a sufficient showing that the statute in question was directed at them.

Amnesty Int'l USA v. McConnell, 646 F. Supp. 2d at 655. The Laird concerns highlighted by the district court—and referenced by then-Judge Breyer in Ozonoff—are not allayed by plaintiffs' self-incurred travel costs. As a matter of law, plaintiffs cannot be the targets of FAA surveillance. Thus, whether they incurred costs or not, they cannot show that information gathering activities under the challenged statute will be directed against them. Indeed, the statute provides specific safeguards to ensure against that possibility, see 50 U.S.C. § 1881a(b)-(d), (f)-(g), as well as strict limits on the use of any information coincidentally intercepted from United States persons, see id. §§ 1801(h), 1806, 1881a(e), 1881e(a).

17

To sidestep the adverse standing conclusion dictated by Laird, the panel attempts to cabin that Supreme Court decision to its facts and to dismiss as dictum any part that might be construed to identify a general rule. See Amnesty Int'l USA v. Clapper, 638 F.3d at 146-48. The panel posits that "the Laird plaintiffs so obviously lacked standing that the Court did not need to create stricter standing rules in the surveillance context in order to deny plaintiffs standing." Id. at 148.[12] I agree that Laird did not establish "stricter" standing rules for surveillance cases. But I cannot agree that the Supreme Court was pronouncing mere dictum when it identified circumstances where a subjective chilling effect cannot support standing. The Court made this point in distinguishing cases in which standing had been recognized even though the "deterrent, or 'chilling,' effect of governmental regulations [fell] short of a direct prohibition against the exercise of First Amendment rights." Laird v. Tatum, 408 U.S. at 11. It stated as follows:

> In none of these cases, . . . did the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual. Rather, in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging.

---

[12] The panel's first observation would presumably have come as a surprise to the four Laird dissenters, especially Justice Douglas, who thought that it was the challenge to, rather than assertion of, plaintiffs' standing that was "too transparent for serious argument." Laird v. Tatum, 408 U.S. at 24 (Douglas, J., with Marshall, J., dissenting); see also id. at 38 (Brennan, J., with Stewart and Marshall, JJ., dissenting).

18

Id. It can perhaps be debated whether the second sentence should be construed as definitional or merely illustrative of circumstances where a chilling effect can establish standing.[13] But what the panel could not do was dismiss the first sentence, which holds that the circumstances there identified cannot support standing. Thus, Laird compels the conclusion here that plaintiffs lack standing because any chilling of their electronic communications with foreign contacts, including costs incurred in forgoing such communications, arose "merely" from their knowledge of the existence of a program that they feared could target their contacts. Laird v. Tatum, 408 U.S. at 11.

In concluding otherwise, the panel not only fails to follow Lyons and Laird, but also misapplies Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167 (2000). In that case, the Supreme Court held that plaintiffs who had taken steps to avoid a polluted river had standing to challenge defendants' unlawful discharge of pollutants into the waterway. The panel cites Laidlaw as support for its conclusion that "[d]espite not being directly regulated, a plaintiff may establish a cognizable injury in fact by showing that he has altered or ceased conduct as a reasonable response to the challenged statute." Amnesty Int'l USA v. Clapper, 638 F.3d at 141. This ignores circumstances critical to the Laidlaw decision that are notably absent from this case. In Laidlaw, the defendant was then

_____

[13] Compare ACLU v. NSA, 493 F.3d at 661 (Batchelder, J.) (interpreting Laird to require that plaintiff "establish that he or she is regulated, constrained, or compelled directly by the government's actions"), with id. at 692 n.3 (Gibbons, J., concurring) (observing that language in Laird might be "merely descriptive" of the facts in prior cases in which the Court found standing). In fact, the question need not be decided in this case, as the district court recognized. See Amnesty Int'l USA v. McConnell, 646 F. Supp. 2d at 654 (noting without deciding question).

19

actually discharging pollutants into the river, making plaintiffs' exposure to those pollutants certain if they resumed their abandoned recreational use of the river. It was in these circumstances where, but for plaintiffs' own forbearance, they would unquestionably have been subjected to the injurious conduct, that the Court addressed the "reasonableness" of plaintiffs' avoidance of the river. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. at 184 (concluding that there was "nothing improbable about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms" (internal quotation marks omitted)). In short, Laidlaw established a two-step standing inquiry, "requir[ing] that plaintiffs demonstrate that they (1) are in fact subject to the defendant's conduct, in the past or future, and (2) have at least a reasonable fear of harm from that conduct." ACLU v. NSA, 493 F.3d at 689 (Gibbons, J., concurring) (emphasis added).

Here, plaintiffs' standing claim fails at the first step of the Laidlaw analysis. They cannot demonstrate that the executive is certainly conducting FAA surveillance of their foreign contacts, much less that if they resume electronically communicating with these contacts, they will in fact be intercepted. Plaintiffs assert that they reasonably fear such interception, but whether they will ever be subject to it remains a matter of complete conjecture. See id. at 656 (Batchelder, J.) (stating with respect to similarly situated plaintiffs that even though their fears of surveillance "may be reasonable, the alternative possibility remains that the NSA might not be intercepting, and might never actually intercept, any communication by any of the plaintiffs named in this lawsuit" (emphasis in original; footnote

20

omitted)).

For that reason, plaintiffs' situation is more aptly analogized to <u>Lyons</u> than to <u>Laidlaw</u> in that they claim only "'subjective apprehensions'" that FAA surveillance will "even <u>take place</u>." <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. at 184 (quoting <u>Los Angeles v. Lyons</u>, 461 U.S. at 107 n.8, in distinguishing two cases) (emphasis in <u>Laidlaw</u>). The distinction the Supreme Court thus draws between the facts supporting standing in <u>Laidlaw</u> and those failing to support standing in <u>Lyons</u> must be recognized as "one of kind, not degree," <u>i.e.</u>, between subjective apprehension in <u>Lyons</u> as to whether challenged governmental conduct would even take place, and the subjective issue in <u>Laidlaw</u> as to whether it was reasonable for plaintiffs to fear harm from pollutants that unquestionably were being discharged into the river. <u>ACLU v. NSA</u>, 493 F.3d at 690 (Gibbons, J., concurring). In short, what was uncertain about the claimed injury in <u>Laidlaw</u> was not defendants' conduct—about which there was no doubt—but the science of pollution. Likewise, in other "prospective injury" cases cited by the panel, the plaintiffs were found to have standing because they were subject to the conduct challenged, or at least certainly would be subject to it if they took certain actions within their control.[14] Thus, as Judge

---

[14] <u>See, e.g.</u>, <u>Davis v. FEC</u>, 554 U.S. 724, 734 (2008) (recognizing plaintiff candidate's standing to challenge campaign finance scheme where he had already declared his intent to spend in excess of statutory trigger and operation of statute would "shortly burden" his expenditure of personal funds); <u>Massachusetts v. EPA</u>, 549 U.S. 497, 521 (2007) (recognizing standing to challenge EPA's refusal to regulate greenhouse emissions, resulting in "actual and imminent" injury to state coastal property due to rising sea levels (internal quotation marks omitted)); <u>Pennell v. City of San Jose</u>, 485 U.S. 1, 8 (1988) (holding, on motion to dismiss, that complaint adequately alleged facts to show that challenged ordinance

21

Gibbons observed, it is error to transform the Supreme Court's holding in Laidlaw, "under which the plaintiffs who were in fact subject to defendant's conduct had standing because they reasonably feared harm from that conduct, into a much broader proposition, under which plaintiffs may establish standing by showing merely that they possess a reasonable fear of being subject to defendant's allegedly harmful conduct." Id. at 689 (emphasis in original). This court needs to say so en banc.

4.      The Factual Record Fails To Satisfy Even the Panel's Reduced Standing Standard

After pronouncing a reduced standing standard at odds with Supreme Court precedent, the panel allows plaintiffs to satisfy that standard on a negligible factual record. The panel identifies actual present injury based on plaintiffs' sworn assertions that "it has become more difficult and expensive to practice their professions as a result of the enactment of the FAA." Lynch, J., Op., ante at **[9 n.6]**; see Amnesty Int'l USA v. Clapper, 638 F.3d at 133. It is no coincidence that the panel summarizes the assertions referenced. A review of the declarations submitted by plaintiffs reveals them to be notably lacking in the requisite

_____

"will be enforced against" plaintiffs, but "strongly suggest[ing]" that future litigants "take pains to supplement the record in any manner necessary" to enable court to address standing inquiry "with as much precision as possible"); Meese v. Keene, 481 U.S. 465, 473 (1987) (recognizing standing to challenge statute requiring certain films to be labeled as "political propaganda" where statute undoubtedly applied to films plaintiff wished to exhibit); Duke Power Co. v. Carolina Envtl. Study Grp., Inc., 438 U.S. 59, 73-74 (1978) (recognizing standing to challenge liability limitation for nuclear accidents that encouraged construction of nuclear plants because plaintiffs were exposed to "'immediate' adverse effects," including undisputed low-level radiation emissions); United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 690 (1973) (holding, on motion to dismiss, that plaintiffs adequately alleged standing to challenge rail surcharge because if facts alleged were proved true, plaintiffs would be "squarely among those persons injured").

22

"specific facts." Lujan v. Defenders of Wildlife, 504 U.S. at 561 (internal quotation marks omitted).[15]

Two declarants conclusorily report only that they "will have to travel" at unspecified future times to avoid FAA interception of their conversations with foreign sources. See Mariner Decl. ¶ 10 (stating that, as a result of FAA, "I will have to travel abroad to gather information that I would otherwise have gathered by telephone or e-mail"); Klein Decl. ¶ 9 (stating that, as a result of FAA, "I will have to travel to gather information that I previously might have gathered by telephone or e-mail"). Two other declarants imply actual travel without providing any particulars. See Hedges Decl. ¶ 9 (reporting that FAA "has made my work very difficult and often requires me to travel to see those who have information" and that "[t]he financial cost and time required to speak with many of my contacts is now immense"); McKay Decl. ¶¶ 8, 10 (stating that, after FAA was enacted, "[w]henever possible," declarant and law partner "collect information in person rather than by telephone or email . . . [which] requires travel that is both time-consuming and expensive"). Finally, one declarant who resides in Washington, D.C., asserts that, "[m]ost recently," she traveled

---

[15] The "certainty and specificity" requirements for standing are not demanded by this judge, as Judge Lynch suggests, see Lynch, J., Op., ante at **[13 n.9]**, but by binding Supreme Court precedent. To the extent Judge Lynch submits that it is impossible for plaintiffs to satisfy that standard with respect to their actual interception under a classified surveillance scheme, that does not permit the panel to relieve plaintiffs of the standing burden established by this precedent. See Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. at 227; ACLU v. NSA, 493 F.3d at 675-76 (Batchelder, J.); see also Livingston, J., Op., post at **[11]**. In any event, Judge Lynch does not—and cannot—use that argument to excuse plaintiffs' failure to adduce "specific facts" to support the self-incurred costs prong of even the panel's reduced standing standard, a matter wholly within plaintiffs' personal knowledge.

"to New York City to meet with" a French barrister to discuss her representation of a Guantanamo Bay detainee. Royce Decl. ¶ 7. Assuming that the declarant incurred costs for this trip—a fact not specifically asserted—those costs cannot constitute FAA injury because the statute would not have permitted interception of electronic communications with a French national who was in New York. See 50 U.S.C. § 1881a(b)(1) (precluding targeting of any person known to be in United States).

Thus, while the panel's identification of self-incurred costs as the actual present injury in this case is legally unsupportable for reasons discussed in the previous section of this opinion, it also lacks the requisite foundation in "specific facts," even without considering the "much more" convincing factual showing required of a non-target. Lujan v. Defenders of Wildlife, 504 U.S. at 561-62.[16]

The panel further concludes that, whether as a matter of causation or actual future injury, plaintiffs demonstrate a reasonable, i.e., not "fanciful," "irrational," or "clearly unreasonable," fear of FAA interception because their fear is "based on a reasonable interpretation of the challenged statute and a realistic understanding of the world." Amnesty

---

[16] Judge Lynch does not acknowledge this concern, relegating it to a see also cite respecting a different point made by Chief Judge Jacobs. See Lynch, J., Op., ante at **[2]**. The concern here identified, however, is not one of panel credulity, declarant veracity, or party collusion—the straw men with whom Judge Lynch chooses to joust. See id. at **[2-4]**. The question is sufficiency. In short, even if the declarants are presumed truthful, how do their conclusory assertions of incurred costs and speculative predictions as to future costs satisfy the "specific facts" requirement for standing established in Lujan v. Defenders of Wildlife, 504 U.S. at 561? No answer to that question can be found either in the panel's opinion or Judge Lynch's concurrence.

24

Int'l USA v. Clapper, 638 F.3d at 139.  But how reasonable can it be to interpret the FAA—a statute that, on its face, requires all interceptions conducted thereunder to be consistent with the Fourth Amendment—to authorize, on its face, interceptions that invariably will violate that amendment?  And what is the basis for plaintiffs' "realistic view of the world" of foreign intelligence surveillance, particularly with respect to the executive's classified targeting priorities and practices?  Plaintiffs do not—and indeed cannot—profess personal knowledge of such matters.  Thus, their identification of foreign contacts as "likely" targets for FAA interception, id. at 126, is completely speculative and not admissible evidence, see Fed. R. Evid. 602; Fed. R. Civ. P. 56(c)(4).[17]

To justify its reliance on these and other similarly unsubstantiated or conclusory assertions by plaintiffs, the panel observes that the government did not object.  See, e.g., Amnesty Int'l USA v. Clapper, 638 F.3d at 127 n.10, 129 & n.13, 133.  But the panel could

---

[17] Judge Lynch submits that it is hardly speculative to think that the government will seek to surveil plaintiffs' overseas contacts such as "alleged Al Qaeda members (and Guantanamo detainees) Khalid Sheik Mohammed and Mohammedou Ould Salahi, as well as those men's families."  Lynch, J., Op., ante at **[13]**.  What is speculative, however, is that these persons will be surveilled under the FAA.  The electronic communications of persons in federal custody are routinely surveilled on a theory of implied consent based on notice.  See United States v. Amen, 831 F.2d 373, 378 (2d Cir. 1987).  Moreover, alleged al Qaeda members and their families are such obvious targets for FISA or NSA surveillance that one can only speculate that the executive would instead use the FAA to monitor their electronic communications.  See ACLU v. NSA, 493 F.3d at 671 (Batchelder, J.) (finding it "reasonable" that FISA Court would authorize interception of communications involving al Qaeda affiliates targeted under challenged NSA surveillance program).  To the extent the real issue here is the possibility of dragnet surveillance, see Lynch, J., Op., ante at **[7 n.4]**, the interception of plaintiffs' contacts—or plaintiffs themselves—pursuant to the FAA is completely speculative for reasons discussed in Parts 5 and 6 of this opinion.

not relieve these non-target plaintiffs of their particularly heavy evidentiary burden, nor could it forgo its own duty to conduct a rigorous inquiry into plaintiffs' standing simply by noting the government's supposed failure to object. See Summers v. Earth Island Inst., 129 S. Ct. at 1152-53 (rejecting dissent view that an assertion that "no one denies" must be accepted as established in evaluating standing). The panel was under an "independent obligation" to assess plaintiffs' standing, even if the government did not call it into question at all. Arizona Christian Sch. Tuition Org. v. Winn, 131 S. Ct. at 1454.

In fact, a glimpse into the actual world of foreign intelligence targeting is afforded by unredacted portions of the FISA Court of Review's opinion in In re FISA Section 105B Directives, 551 F.3d 1004, and that world appears quite different from the one hypothesized by plaintiffs. That case presented an as-applied challenge to now-expired amendments to FISA effected through the PAA, which allowed the executive "to conduct warrantless foreign intelligence surveillance on targets (including United States persons) reasonably believed to be located outside the United States," subject to specified criteria, including the adoption of targeting and minimization procedures akin to those now required by the FAA, but with no prior court review. Id. at 1006-07 (internal quotation marks omitted). After holding that foreign intelligence surveillance is not subject to the Fourth Amendment warrant requirement, see id. at 1012, the court addressed a Fourth Amendment reasonableness challenge based on the PAA's failure to require particularity, judicial review of probable cause, or adequate proxies for these omitted protections, see id. at 1013. Before rejecting the claim, the court reviewed the actual procedures adopted by the executive to satisfy PAA

requirements and found that they in fact afforded "protections above and beyond those specified" in the statute, id. at 1007, and adequately allayed any particularity or probable cause concerns, see id. at 1013-14 & n.7 (specifically noting that procedures adopted by executive to comply with PAA incorporated executive order that required Attorney General to determine in each case, based on information provided pursuant to Department of Defense regulations, that probable cause existed to believe that targeted person is foreign power or agent of foreign power). Such scrupulous oversight rebuts any general assumptions, unsupported by specific facts, that the executive will instinctively abuse its targeting discretion under the FAA—a statute that goes further than the PAA in subjecting executive targeting and minimization procedures to judicial review and in conditioning court orders on a specific finding that the procedures are "consistent . . . with the fourth amendment." 50 U.S.C. § 1881a(i)(3)(A). Further, it reinforces the need for this court to clarify en banc that, consistent with Supreme Court precedent, plaintiffs' standing depends on their showing actual or imminent FAA interception.

5.      The Panel Decision Creates a Circuit Split

The most obvious reason why plaintiffs cannot show that they are subject to actual or imminent FAA interception is because that statute does not direct that any foreign intelligence surveillance be conducted; it merely authorizes the executive to undertake such surveillance pursuant to specified statutory requirements and protections. This is not to suggest that the executive will not exercise FAA authority. I assume that it will. I further assume that the FAA authorizes dragnet surveillance. Nevertheless, neither plaintiffs nor this

27

court can know the extent to which the executive will seek or the FISA court authorize the exercise of such surveillance authority. That is the point Judge Lynch ignores in his mistaken identification of a "palpable" contradiction between the preceding two sentences and any concern with plaintiffs' standing. Lynch, J., Op., ante at **[13 n.9]**. In fact, any decisions to seek or grant FAA surveillance authority depend, among other things, on national security priorities, available resources, alternative means of surveillance, and, of course, Congress's mandate that all FAA surveillance be conducted in compliance with the Fourth Amendment. In these variable circumstances, plaintiffs cannot show that their foreign contacts are certain to be targeted for FAA surveillance. Much less can they show that their own FAA interception is certainly impending. See Lujan v. Defenders of Wildlife, 504 U.S. at 564 n.2. Rather, they can only speculate.

Those of our sister circuits to have confronted challenges to other programs authorizing, but not directing, intelligence surveillance have uniformly found that plaintiffs lacked standing precisely because they could not demonstrate actual or imminent interception under such schemes. See United Presbyterian Church v. Reagan, 738 F.2d at 1380 (Scalia, J.) (stating that even if plaintiffs may be "at greater risk than the public at large" to being targeted for surveillance, such risk falls "far short of the 'genuine threat'" of harm required to support standing); accord Al-Haramain Islamic Found., Inc. v. Bush, 507 F.3d at 1205 (holding that despite plaintiff's formal designation as "global terrorist" organization subject

to NSA surveillance, threat of such surveillance was too speculative to support standing);[18] ACLU v. NSA, 493 F.3d at 667 (Batchelder, J.) (holding that plaintiffs who adduced no evidence that NSA "actually intercepted (or will actually intercept) any of their conversations" could not rely on "a possibility" of future interception to establish standing (emphasis in original)); id. at 689 n.2 (Gibbons, J., concurring) (distinguishing between persons demonstrably subject to challenged policy, and persons who merely fear that policy may be enforced against them, in concluding that plaintiffs lacked standing to challenge warrantless NSA surveillance program that might target persons with whom they regularly communicated).

The panel dismisses these cases as not binding on this court. See Amnesty Int'l USA v. Clapper, 638 F.3d at 149. True enough, but the fact remains: their reasoning comports with the Supreme Court's holdings in Lyons, Laird, and Laidlaw, whereas the panel's does not.[19] The court should convene en banc to eliminate the unnecessary circuit split created by

_____

[18] In Al-Haramain, the inadvertent disclosure of a classified document indicated that the plaintiffs had in fact been intercepted by NSA surveillance. Nevertheless, because the document was protected by the state secrets privilege, the court concluded that plaintiffs lacked standing because they failed to point to any admissible evidence that their fear of interception was more than conjectural. See Al-Haramain Islamic Found., Inc. v. Bush, 507 F.3d at 1205.

[19] Judge Lynch attempts further to distinguish these cases factually, asserting that United Presbyterian Church presents a broader challenge than this case, see Lynch, J., Op., ante at **[14-15]** (contrasting challenge to constitutionality of entire national intelligence gathering system in that case with challenge to specific statute in this case), and ACLU v. NSA a narrower one, see id. at **[15]** (contrasting challenge to NSA warrantless surveillance program targeting persons associated with al Qaeda in that case with challenge to statute that permits dragnet surveillance here). He does not explain, however, how these differences

the panel decision.

6.  Statutory "Gates" to FAA Interception, Including Judicial Review, Make Plaintiffs' Interception Particularly Speculative

Plaintiffs' standing burden is, in fact, heavier in this case than in those confronting our sister circuits. In each of those cases, the challenged programs involved intelligence surveillance conducted under executive authority without congressional authorization or

make it easier for these plaintiffs to establish standing.

Judge Lynch also submits that the injury at issue in United Presbyterian Church was limited to subjective chilling, whereas the plaintiffs here "suffered concrete harms—including the expenditure of funds." Id. at **[14-15]**. In fact, the plaintiffs in United Presbyterian Church alleged past surveillance plus subjective chilling. See United Presbyterian Church v. Reagan, 738 F.2d at 1380 ("The third kind of harm appellants allege is that some of them have been or are currently subjected to unlawful surveillance."). Plaintiffs here do not claim any past FAA surveillance. No matter. The facts alleged in United Presbyterian Church cannot satisfy standing under the rules enunciated in City of Los Angeles v. Lyons, 461 U.S. at 107 & n.8, and Laird v. Tatum, 408 U.S. at 10-11. And for the reasons discussed, see supra Part 3, no different conclusion is warranted by plaintiffs' purported expenditures to avoid feared FAA interception when Lyons and Laird are properly construed consistent with Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. at 184.

Judge Lynch states that in ACLU v. NSA, "the government argued that it would not be able to address the question of standing without disclosing state secrets," whereas here, the government did not invoke the state secrets privilege. Lynch, J., Op., ante at **[15]**. As I read ACLU v. NSA, the government invoked the state secrets privilege not for the reason stated by Judge Lynch, but "to bar the discovery or admission of evidence" by plaintiffs of evidence that might compromise national security. ACLU v. NSA, 493 F.3d at 650 (Batchelder, J.). In short, the government's argument was not that it could not address standing without the disclosure of this evidence, but that "without the privileged information, none of the named plaintiffs could establish standing." Id. Deciding the case "solely on the publicly available information that was admitted by the district court and made a part of its record," id. at 650 n.3, the Sixth Circuit concluded that the plaintiffs failed to establish standing under the principles established in Lyons, Laird, and Laidlaw. Thus, raising the specter of the state secrets privilege in this case is a red herring. The plaintiffs, who never sought any discovery that was denied under that privilege, simply do not demonstrate standing under binding Supreme Court precedent.

30

judicial review. By contrast, the powers of all three branches of the federal government are united to support FAA surveillance. See United States v. Abu-Jihaad, 630 F.3d at 121 (citing Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635–37 (1952) (Jackson, J., concurring)). More to the point for purposes of standing, when Congress authorized FAA surveillance, it erected a number of statutory "gates" through which the executive must pass before it can intercept any communications. At each gate, the sphere of possible interceptions can be narrowed, whether by limitations on targeting, minimization requirements, judicial review, or a Fourth Amendment mandate. Thus, to demonstrate that they are subject to actual or imminent FAA surveillance, plaintiffs must show not only that it is certain that the executive will target their foreign contacts—which plaintiffs cannot do—but also that interception of these particular contacts (and, coincidentally, plaintiffs themselves) is certain to take place despite required targeting limits, minimization, judicial review, and the statute's overarching Fourth Amendment mandate.

The decision in In re FISA Section 105B Directives, 551 F.3d at 1013-14 & n.7, demonstrates why plaintiffs cannot show that their interception is certain notwithstanding the targeting and minimization procedures required by the FAA. As for judicial review, the panel's dismissal of that intermediate step notably fails to mention the FISA court's obligation to make an independent Fourth Amendment finding before issuing any FAA order. Instead, the panel implies that FISA court judges will simply rubber stamp FAA surveillance applications and, in support, cites empirical evidence showing that, in 2008, FISA court judges approved 2,081 of 2,082 surveillance applications. See Amnesty Int'l USA v.

31

Clapper, 638 F.3d at 140 (acknowledging that evidence does not indicate "how many of these applications, if any, came after the FAA was enacted on July 10, 2008"). I respectfully disagree. The statistics merit little consideration; they could just as easily reflect the executive's scrupulous compliance with statutory requirements before submitting applications for judicial review. See generally In re FISA Section 105B Directives, 551 F.3d at 1007 (recognizing that executive was more protective than PAA required in conducting warrantless surveillance under that statute).

More important, the panel fails to tell the whole story when it states that the FISA court "must" order FAA surveillance if the executive's certification "conforms to the statutory requirements." Amnesty Int'l USA v. Clapper, 638 F.3d at 139. To be sure, the FISA court must find that the executive's certification "contains all the required elements." 50 U.S.C. § 1881a(i)(3)(A). But it must further find for itself that the executive's targeting and minimization procedures conform to all statutory requirements and are consistent "with the fourth amendment." Id. Far from cabining judicial review, this provision was intended to "ensur[e] FISA Court involvement in any aspect of the new procedure for targeting foreigners outside the United States that could involve U.S. persons." 154 Cong. Rec. S6181 (daily ed. June 26, 2008) (statement of Sen. Rockefeller, then-Chairman, S. Select Comm. on Intelligence); see also 154 Cong. Rec. S6389 (daily ed. July 8, 2008) (sectional analysis of FAA presented by Sen. Bond) (explaining that if FISA court determines that targeting and minimization procedures are inconsistent with FAA's requirements or Fourth Amendment, then it "shall order the Government, at its election, to correct any deficiencies or cease, or

not begin, the acquisition").[20]

There is no reason to think that the Article III judges who serve on the FISA court will be timid in exercising this review authority. Well before the FAA was enacted, the FISA Court of Review ruled that FISA court judges were authorized to scrutinize government applications, including "certifications," and to seek more information as warranted to ensure compliance with statutory requirements. In re Sealed Case, 310 F.3d 717, 735-36 (FISA Ct. Rev. 2002). Thus, they can be expected to do the same in conducting the constitutional review mandated by the FAA. See generally In re FISA Section 105B Directives, 551 F.3d at 1008 (noting that, in reviewing constitutional challenge to PAA, FISA court "handed down a meticulous opinion").[21]

---

[20] Judge Lynch persists in minimizing the FAA's Fourth Amendment mandate by stating that the FISA court determines only if "the government's general procedures" satisfy the Fourth Amendment. Lynch, J., Op., ante at **[5-6]** (emphasis in original). Those "general procedures," however, pertain to targeting, i.e., identifying who will be intercepted, and minimization, i.e., deciding what can be intercepted, surely core Fourth Amendment concerns. Further, the statute's Fourth Amendment requirement applies generally to the conduct of FAA surveillance, see 50 U.S.C. § 1881a(b)(5), which makes it more difficult to cabin as Judge Lynch suggests.

[21] The FISA court's decision in In re Proceedings Required by § 702(i) of the FISA Amendments Act of 2008, No. Misc. 08-01, slip op. (FISA Ct. Aug. 27, 2008), cited by plaintiffs in their brief on appeal, is not to the contrary. The court there adopted the ACLU's characterization of the court's role in FAA proceedings as "narrowly circumscribed," id. at 3 (internal quotation marks omitted), only to explain that its statutory obligation is to review the executive's certification, targeting, and minimization procedures, not to conduct "a facial review" of the FAA's constitutionality, id. at 9-10. The court specifically acknowledged, however, that for any FAA application, it "must decide whether the targeting and minimization procedures are consistent with the Fourth Amendment." Id. at 9 (citing 50 U.S.C. § 1881a(i)(3)(A)).

In sum, plaintiffs fail to establish standing because they can only speculate that they will ever be intercepted by FAA surveillance.

7.      Plaintiffs Fail to Demonstrate Redressabilty

Having recast the standing standard to allow plaintiffs to carry their injury burden by reference to self-incurred costs, and their causation burden by demonstration of a not-irrational fear of FAA interception, the panel addressed the final constitutional requirement, redressability, in a footnote.  Acknowledging that the element had received little attention from the district court or the parties, the panel nevertheless found it satisfied, explaining that plaintiffs' injuries, i.e., their costs, stemmed from a reasonable fear of FAA interception "and if a court grants their requested relief—an injunction prohibiting the government from conducting surveillance under the FAA—the feared surveillance would no longer be permitted and therefore would, presumably, no longer be carried out."  Amnesty Int'l USA v. Clapper, 638 F.3d at 140 n.24.  The requirement cannot be dismissed so easily.

To demonstrate redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. at 561 (internal quotation marks omitted); accord Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. at 181.  Under the panel's analysis, the relevant injury is not FAA interception, but plaintiffs' professional costs.  Thus, to carry their burden on redressability, plaintiffs had to adduce evidence that enjoining FAA surveillance would relieve them of the need to incur such costs.  Such a conclusion cannot withstand scrutiny.

Plaintiffs' theory of standing is predicated on the assertion that their foreign contacts

34

are "likely" to be targeted for FAA surveillance because they are "people the U.S. government believes or believed to be associated with terrorist organizations, political and human rights activists who oppose governments that are supported economically or militarily by the U.S. government, and people located in geographic areas that are a special focus of the U.S. government's counterterrorism or diplomatic efforts." Amnesty Int'l USA v. Clapper, 638 F.3d at 127 (internal quotation marks omitted). But if the United States intelligence community is as inclined to monitor such persons' communications as plaintiffs assert, then enjoining the FAA will merely eliminate one of several means for achieving that objective. It will not shield plaintiffs or their contacts from the universe of alternative electronic surveillance options available to the government. After FISA's original enactment, warrantless radio surveillance of international communications carried by satellite and wire surveillance of international communications performed on foreign soil or offshore continued to be conducted outside that statutory regime, as long as United States persons located in this country were not specifically targeted.[22]

---

[22] The Supreme Court has never ruled that foreign intelligence surveillance must be conducted pursuant to court order. See United States v. Abu-Jihaad, 630 F.3d at 121 (noting that question remains unresolved by Supreme Court). Rather, Congress has required, and the executive has agreed, that some foreign intelligence surveillance will be so conducted as specified in FISA and various amendments thereto, such as the FAA. See id. (recognizing that when executive conducts foreign intelligence surveillance pursuant to statutory authority and court order, the whole of federal authority unites in defining such activity as reasonable search).

While FISA provides the "exclusive means" for conducting "electronic surveillance" as that term is defined in that statute, 18 U.S.C. § 2511(2)(f), this does not mean that foreign intelligence surveillance not authorized by FISA is proscribed, an inference that might mistakenly be drawn from the panel's observation that "[t]he FAA was passed specifically

35

to permit surveillance that was not permitted by FISA but that was believed necessary to protect the national security," Amnesty Int'l USA v. Clapper, 638 F.3d at 138. Indeed, Judge Lynch only adds to the confusion when he states that "the FAA indisputably and significantly broadens the risk of interception, lowers the government's probable-cause burden, and decreases the oversight role" of the FISA court. Lynch, J., Op., ante at **[4]**. The statement rests on an assumption that is not the case: that all surveillance now covered by the FAA was previously covered by FISA.

In fact, FISA's history shows that Congress specifically chose not to subject all foreign intelligence surveillance to that law. See, e.g., S. Rep. No. 95-701, at 34 (1978) (explaining that FISA warrant requirement "does not apply to the acquisition of the contents of international or foreign communications, where the contents are not acquired by intentionally targeting a particular known U.S. person who is in the United States"); id. at 71 (stating that FISA "does not deal with international signals intelligence activities as currently engaged in by the [NSA] and electronic surveillance conducted outside the United States"). Nor did Congress extend FISA to all foreign intelligence surveillance in which a United States person might coincidentally be intercepted. See, e.g., Foreign Intelligence Electronic Surveillance: Hearing Before the Subcomm. on Legis. of the H. Permanent Select Comm. on Intelligence, 95th Cong., 2d Sess., at 172 (Jan. 10, 1978) (statement of Sen. Kennedy) (stating that "targeted sweeps" aimed at known United States persons in this country would be covered by FISA, but "nontargeted sweeps" by the NSA "would not be covered").

Some thirty years later, in hearings leading to the enactment of the FAA, the Directors of National Intelligence and the Central Intelligence Agency ("CIA") explained why technological assumptions informing FISA had become outmoded and created confusion as to what foreign intelligence surveillance did and did not fall within that law's parameters. See, e.g., Modernization of the Foreign Intelligence Surveillance Act: Hearing Before the S. Select Comm. on Intelligence, 110th Cong., 1st Sess., at 19 (May 1, 2007) (statement of Adm. J. Michael McConnell, Director of National Intelligence) ("Legislators in 1978 could not have been expected to predict an integrated global communications grid that makes geography an increasingly irrelevant factor. Today, a single communication can transit the world even if the two people communicating are only located a few miles apart. And yet simply because our law has not kept pace with technology, communications intended to be excluded from FISA are in fact included."); FISA for the 21st Century: Hearing Before the S. Comm. on the Judiciary, 109th Cong., 2d Sess., at 9 (July 26, 2006) (statement of Gen. Michael Hayden, Director, CIA and former Director, NSA) (observing that "NSA may have multiple opportunities to intercept [a communication] as it moves and as it changes medium" and that "[a]s long as a communication is otherwise lawfully targeted, I believe we should be indifferent to where the intercept is achieved").

In response to these concerns, the FAA authorizes the executive, upon FISA court order, to secure from electronic communication service providers assistance to acquire

36

Thus, even if FAA surveillance were enjoined, the government could still conduct surveillance by other means, such as FISA-exempt NSA surveillance programs or, in certain cases, FISA itself. Whether or not these alternatives would be more difficult or time-consuming is not the point. The critical fact is that plaintiffs would not know whether such alternative surveillance was being conducted with respect to contacts whom plaintiffs assert are of obvious foreign intelligence interest. See generally ACLU v. NSA, 493 F.3d at 671 (Batchelder, J.) (concluding that enjoining NSA warrantless surveillance of terrorists and their affiliates would not redress plaintiffs' fears of interception because of likelihood that FISA court would authorize such interceptions). Moreover, the United States is hardly the only government conducting electronic surveillance. Even without the FAA, then, plaintiffs would confront a real possibility that their foreign contacts, particularly those believed to be associated with terrorist organizations or opposed to established governments, would be

_____

foreign intelligence information from non-United States persons located outside this country. Contrary to the panel's characterization, the FAA does not authorize conduct that Congress intended to proscribe in FISA. Rather, it subjects some foreign intelligence surveillance that previously may have been conducted pursuant to executive order to new statutory limitations, including judicial review. At the same time, it clarifies that some foreign intelligence surveillance that might have been thought to fall within FISA's original terms should instead be conducted pursuant to the requirements and protections outlined in the FAA. See generally United States v. Abu-Jihaad, 630 F.3d at 121-22 ("[T]he Constitution's warrant requirement is flexible, so that different standards may be compatible with the Fourth Amendment in light of the different purposes and practical considerations at issue." (internal quotation marks omitted)). It is in this context that I question whether plaintiffs' profession that they have greater reason to fear interception after the FAA's enactment than before can withstand the required rigorous scrutiny.

37

prime targets for surveillance by other countries, including their own.[23]  Thus, neither their

fear of interception nor their need to incur costs to avoid such interception would be

redressed by enjoining FAA surveillance.

Apparently, the government made this point at oral argument on appeal.  See Amnesty

Int'l USA v. Clapper, 638 F.3d at 129 n.13 (observing that "government professed itself

'puzzled' as to why the plaintiffs had not been just as nervous about being monitored before

the FAA was enacted as they are now").  The panel, however, concluded that the government

could not question the genuineness of plaintiffs' assertions as to the impact of the FAA on

their work because it had failed to submit contrary evidence or to seek a hearing in the

district court.  See id.  I am not convinced.  A standing determination is not a debate round,

where an unchallenged point, however unsubstantiated, is scored for its proponent.  See

generally Lujan v. Defenders of Wildlife, 504 U.S. at 581 (Kennedy, J., concurring)

(observing that standing requirements ensure that "legal questions . . . will be resolved, not

in the rarified atmosphere of a debating society, but in a concrete factual context conducive

to a realistic appreciation of the consequences of judicial action" (internal quotation marks

omitted)).  Rather, as earlier noted, a federal court is under an "independent obligation to

consider standing, even when the parties do not call it into question."  Arizona Christian Sch.

Tuition Org. v. Winn, 131 S. Ct. at 1454; see Summers v. Earth Island Inst., 129 S. Ct. at

---

[23] See, e.g., Walsh Decl. ¶ 11 (acknowledging that Cuban contacts "believe that their calls could be monitored by the Cuban government," which makes them disinclined to speak about Cuban policy, but willing to speak—presumably critically—about U.S. policy).

1152. That obligation requires an especially rigorous inquiry into self-serving assertions unsupported by specific facts. Indeed, the obligation applies with particular force where, as here, the injury to be redressed is self-inflicted, making it appropriate to consider whether, if the fear is genuine, it would persist even if the relief sought were granted.

The concerns raised by the panel's redressability analysis only reinforce the need to review this case en banc. I emphasize, however, that such review, if conducted in accordance with established Supreme Court precedent, would never reach the issue of redressability. Plaintiffs' standing claim fails at the injury step of analysis because they have not demonstrated that they are subject to actual or imminent FAA interception.

* * *

To summarize, this case demands en banc review because the panel's recognition of plaintiffs' standing based on costs incurred to avoid a not-irrational fear of FAA interception effectively establishes a novel, reduced standing standard that

(1) cannot be substituted for the "especially rigorous" inquiry required when a party challenges an act of Congress that cannot target him;

(2) fails to address prudential concerns raised by plaintiffs' articulation of their Fourth Amendment claim;

(3) cannot be reconciled with Supreme Court precedent (a) rejecting subjective fear as a basis for standing, and (b) recognizing standing based on forbearance action only when, but for his forbearance, a plaintiff would certainly be subject to the challenged conduct;

(4) is not, in any event, supported by "substantial facts" in this case;

39

(5) creates a split between this court and three of our sister circuits in analyzing standing to challenge foreign intelligence surveillance programs;

(6) misconstrues the FAA in dismissing various intervening steps that preclude plaintiffs from demonstrating that they are subject to actual or imminent interception under that statute; and

(7) assumes redressability without rigorous inquiry or substantial facts.

Insofar as the court today denies rehearing en banc, it is not the six judges who dissent from that decision who "close" any courthouse doors. Lynch, J., Op., ante at **[17]**. Rather, it is our remaining colleagues who decline to consider whether a questionable standing standard should become the law of this circuit. There is, however, another courthouse, and those of us here in dissent can only hope that its doors will be opened for further discussion of this case.

40

DEBRA ANN LIVINGSTON, *Circuit Judge*, with whom Chief Judge JACOBS, Judge CABRANES, Judge RAGGI, and Judge WESLEY join, dissenting from the denial of rehearing *en banc*:

I join fully in Judge Raggi's scholarly opinion dissenting from the denial of rehearing *en banc*. I write separately only to address the degree to which the panel's opinion, in frank disregard of clear Supreme Court authority, threatens a *sub silentio* transformation of this Circuit's case law regarding so-called "probabilistic harm" — meaning, the narrow circumstances in which this Court has recognized injury in fact to exist based on the risk of some future harm.

The Supreme Court has repeatedly instructed that injury in fact must be actual or imminent to afford Article III standing to a would-be plaintiff. Thus, in *Whitmore v. Arkansas*, 495 U.S. 149 (1990), the Court, summarizing its case law, stated flatly that threatened injuries must be "certainly impending" to constitute injury in fact: "[W]e have said many times before and reiterate today: Allegations of possible future injury do not satisfy the requirements of Art[icle] III." *Id.* at 158. Only two Terms ago, the Court affirmed that even the *statistical probability* of future harm is not enough: standing, the Court said, "'is not "an ingenious academic exercise in the conceivable" . . . [but] requires . . . a factual showing of perceptible harm.'" *Summers v. Earth Island Inst.,* 555 U.S. 488, 129 S. Ct. 1142, 1152 (2009) (alteration in original) (omissions in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566 (1992)).

Despite such repeated admonitions, the panel concluded that the plaintiffs established standing based on their alleged fear of future surveillance because there is an "objectively reasonable likelihood" that plaintiffs' communications will, at some point, be monitored. *Amnesty Int'l USA v. Clapper*, 638 F.3d 118, 134 (2d Cir. 2011). Even assuming such a likelihood (which, in fact, has not been shown), the panel did not explain its disregard of the Supreme Court's requirement that injury must be actual or imminently threatened, *see, e.g., Summers*, 129 S. Ct. at 1148, nor did it

1

justify its attempt at expansion of the limited circumstances in which this Circuit has found injury in fact to be present based on a risk of future harm.

Judge Lynch, in his opinion concurring in the denial of en banc review, answers this charge with a simple, "Not so." He then cites to the plaintiffs' supposed *present* injury — the costs they allegedly incurred as a result of their fear of surveillance — in an effort to substantiate his point. Lynch, J., Op. Concurring in Denial of Reh'g En Banc 10 n.6. But the plaintiffs here relied on *two* asserted injuries in their bid for standing — not only on their present costs, but also on their asserted fear of future surveillance. The panel opinion addresses both. With regard specifically to the *future* injury, moreover — meaning, the plaintiffs' claimed fear of surveillance pursuant to the FISA Amendments Act of 2008 ("FAA") at some future point — the panel opinion concludes, remarkably, as follows:

> To determine whether the plaintiffs have standing under their future-injury theory, we would need to determine whether the FAA creates an *objectively reasonable likelihood* that the plaintiffs' communications are being or will be monitored under the FAA. As noted above, we conclude that the future injuries alleged by the plaintiffs are indeed sufficiently likely [to occur] to confer standing under the test established in the case law for basing standing on the risk of future harm.

638 F.3d at 134 (emphasis added). With respect, this simply ignores the Supreme Court's admonition that "[a]llegations of possible future injury do not satisfy the requirements of Art[icle] III." *Whitmore*, 495 U.S. at 158. Neither the panel opinion nor Judge Lynch's concurrence, moreover, offers any refutation of the analysis here, nor even a word of justification for this wholesale broadening of the narrow circumstances in which this Circuit has found injury in fact to be present based on a risk of future harm.

Having proffered only a token response to the serious questions that his standing analysis raises, Judge Lynch concludes his concurrence by suggesting that anyone who disagrees with the

2

panel's novel approach to standing seeks without warrant "to close the courthouse doors." Lynch, J., Op., *ante* at 18-19. This charge is perhaps ironic, given that six members of this Court — a full half of its active judges — have vigorously sought to open those doors to a more careful examination of the panel's startling standing conclusions but have been thwarted in this effort, and despite the universally acknowledged "exceptional importance" of the issue presented.

Again with due respect, the Constitution sets limits not only on the power of Congress, as Judge Lynch's concurrence affirms, but also on that of judges. It is thus not the "glory of our system," as the concurrence would have it, *see* Lynch, J., Op., *ante* at 18, that elected leaders must answer to unelected judges whenever a challenge is asserted. Article III of the Constitution instead limits the judicial power "to redress[ing] or prevent[ing] actual or imminently threatened injury to persons caused by private or official violation of law." *Summers*, 129 S. Ct. at 1148. As the Supreme Court said only two Terms ago, "[e]xcept when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action." *Id.*

In concluding, without explanation, that injury in fact has been established here based on a mere "reasonable likelihood" that the plaintiffs might one day be surveilled, the panel opinion in this matter provokes a reasonable fear, but not of an obstinate closure of courthouse doors. The fear, instead, is of judges arrogating to themselves a power inconsistent with both our constitutional design and the role of courts in a democratic society. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975). The panel's wholesale (if unacknowledged) disavowal of Supreme Court precedent in its assessment of the plaintiffs' "future injury" claim thus represents a further basis — in addition to the many identified by Judge Raggi in her thorough and thoughtful opinion — for *en banc* review.

* * *

3

As Judge Raggi's dissent points out, the panel's conclusion that the plaintiffs have established standing was based in part on an alleged "present injury" — their self-inflicted costs purportedly incurred as a result of a claimed fear of surveillance under the FAA. *Amnesty Int'l*, 638 F.3d at 138. I share Judge Raggi's view that the panel failed to demonstrate how an injury of this sort can be termed "fairly traceable" to the FAA under the existing precedents of the Supreme Court or this Circuit. I note, however, that the panel opinion does not even truly address the degree to which the plaintiffs' vaguely alleged self-inflicted costs must be shown to be fairly traceable to the FAA in the first place. Rather, it comes to the startling conclusion that because the *future* surveillance the plaintiffs claim to fear is "sufficiently likely [to occur] to confer standing under the test established in the case law for basing standing on the risk of future harm," *id.* at 134, the panel "need not and do[es] not decide whether the degree of likelihood necessary to establish a causal relationship between an actual present injury and the challenged governmental action is as stringent as that necessary for a potential harm in itself to confer standing," *id.*

The conclusion that the alleged risk of future surveillance here suffices to constitute injury in fact is truly unprecedented. The panel arrives at it by asserting that the standard for assessing an alleged future harm of this sort asks "whether the FAA creates an objectively reasonable likelihood that the plaintiffs' communications are being or will be monitored under the FAA." *Id.* The panel opinion provides no authority for this novel standard but instead obscures the *lack* of authority for its "future injury" holding in two ways.

First, the panel conflates the rare cases in which standing has been established based on an increased risk of harm with a distinct line of cases — inapplicable here — in which a plaintiff undisputedly subject to a particular statute is permitted to bring a pre-enforcement facial challenge

4

even though he cannot establish with certainty that he will face prosecution should he violate the statute's terms. Thus, the opinion asserts as a general matter that "where a 'plaintiff's interpretation of a statute is "reasonable enough" and under that interpretation the plaintiff "may legitimately fear that it will face enforcement of the statute," then the plaintiff has standing to challenge the statute.' " *Id.* at 138 (quoting *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008) (quoting *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000))). The cited cases, however, do not reflect a general endorsement of the proposition that a plaintiff has standing to challenge *any* statute from which he "legitimately fear[s]" harm based on a "reasonable enough" interpretation, nor could they, consistent with the Supreme Court's case law regarding standing based on future harm. Rather, these cases reflect a particular standard applicable to the specific context of pre-enforcement facial challenges, under which "[a] plaintiff . . . need not demonstrate to a certainty that it will be prosecuted under the statute to show injury, but only that it has 'an actual and well-founded fear that the law will be enforced against' it." *Vt. Right to Life Comm.*, 221 F.3d at 382 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)). Because the FAA is not a regulatory statute that could be enforced against any plaintiff in this proceeding, these pre-enforcement facial challenge cases are of no relevance here.

The panel next purports to rely on the Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), a case it terms "the seminal case on standing based on probabilistic or prospective harm." *Amnesty Int'l*, 638 F.3d at 136. Of course, *Lyons* is the same case that the Supreme Court described two Terms ago as "an opinion that did *not* find standing, so the seeming

5

expansiveness of [its] test made not a bit of difference." *Summers*, 129 S. Ct. at 1153.[1] Moreover, the *Summers* Court, in rejecting the claim that *Lyons* set out a new and less stringent general standard for the use of prospective harm to establish Article III standing, went on expressly to decline to replace the familiar requirement that a future harm be "imminent" to constitute injury for the purposes of standing with one that would grant standing based on a mere "realistic threat" that challenged activity will recur "in the reasonably near future." *Id.* at 1152-53 (italics omitted) (internal quotation marks omitted). Plainly, *Lyons* presents no authority for the notion that the majority's novel "objectively reasonable likelihood" test should be substituted for the Supreme Court's clear statement that "[a] threatened injury must be 'certainly impending' to constitute injury in fact." *Whitmore*, 495 U.S. at 158 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)) (internal quotation marks omitted).

As this Court has expressly acknowledged in the past, the case law recognizing that, under certain circumstances, "threatened harm in the form of an increased risk of future injury may serve as an injury-in-fact for Article III standing purposes" has developed largely in the courts of appeals, *Baur v. Veneman*, 352 F.3d 625, 633 (2d Cir. 2003), and, in particular, in the specific context of environmental and health-related litigation, *see Natural Res. Def. Council v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006) ("[W]e have recognized that increases in risk can *at times* be 'injuries in fact' sufficient to confer standing. Environmental and health injuries often are purely probabilistic." (emphasis added) (citation omitted)); *see also Ctr. for Law and Educ. v. Dep't of Educ.*, 396 F.3d

---

[1] *Curtis v. City of New Haven*, 726 F.2d 65 (2d Cir. 1984), described by the panel as "articulat[ing] the principle of *Lyons* as requiring an inquiry into the probability of future harm," *Amnesty Int'l*, 638 F.3d at 136, is similarly a case in which this Court denied standing, *see Curtis*, 726 F.2d at 68-69, and thus any attempt by the panel to make use of the expansiveness of the standing principle *Curtis* supposedly articulated is subject to the same critique.

6

1152, 1161 (D.C. Cir. 2005) ("Outside of increased exposure to environmental harms, hypothesized 'increased risk' has never been deemed sufficient 'injury.'"); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000) (en banc) ("Threatened environmental injury is by nature probabilistic."). To the limited extent the Supreme Court has itself suggested that increased risk may be relevant for standing purposes, moreover, it too has done so in the specific context of suits alleging environmental harm. *See Massachusetts v. EPA*, 549 U.S. 497, 520-23 (2007) (recognizing as injury a state's actual loss of coastal land and the risk of future loss over the course of the next century); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183-85 (2000) (concluding that environmental plaintiffs subject to pollution establish injury in fact when the pollution lessens their aesthetic and recreational enjoyment of a certain place they visit, even if uncertainty exists as to the environmental harm being caused). These cases announce no general departure from the "actual or imminent" standard. Indeed, the Supreme Court's recent decision in *Massachusetts v. EPA,* which found injury in fact arising in part from the risk of future loss of coastal land, did so only in a context in which it also carefully noted that at least two special circumstances — not present here — justified relaxation of the traditional standing rules that would otherwise apply.[2]

---

[2] Thus, the Court noted that Congress had accorded the litigants in *Massachusetts v. EPA* a procedural right to protect their concrete interests, such that these litigants could "assert that right without meeting all the normal standards for redressability and immediacy." 549 U.S. at 517-18 (quoting *Lujan*, 504 U.S. at 572 n.7) (internal quotation marks omitted). In addition, the Court also relied on the fact that the party seeking review was a sovereign State rather than a private individual — a factor the Court determined entitled the Commonwealth to "special solicitude" in its standing analysis. *Id.* at 520. The absence of both circumstances here limits the applicability of *Massachusetts v. EPA* to this case. *See* Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer & David L. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 145-46 (6th ed. 2009) (noting the diversity of grounds relied on by the Supreme Court in *Massachusetts v. EPA* and querying whether this aspect of the decision may limit its import in

"Probabilistic" injury has thus never been recognized by the Supreme Court or this Circuit as sufficient as a general matter to constitute injury in fact for the purposes of Article III standing, and for good reason — as the D.C. Circuit has noted, "were all purely speculative 'increased risks' deemed injurious, the entire requirement of 'actual or imminent injury' would be rendered moot, because all hypothesized, non-imminent 'injuries' could be dressed up as 'increased risk of future injury.'" *Ctr. for Law and Educ.*, 396 F.3d at 1161. Such an approach would threaten grossly to distend the Judicial Branch's proper role of deciding actual cases or controversies, rendering almost any governmental action or inaction at least potentially subject to judicial review so long as a court was willing to deem it "reasonably likely" that a plaintiff might one day be affected as a result.

This Circuit's principal "probabilistic injury" case (prior to the dramatic expansion of the category that the panel opinion threatens to effect) was *Baur*, a case in which the majority expressly noted that it "need not decide as a matter of law whether enhanced risk generally qualifies as sufficient injury to confer standing" and did not "purport to imply that we would adopt such a broad view." *Baur*, 352 F.3d at 634. Rather, it held only that "[i]n the specific context of food and drug safety suits, . . . such injuries are cognizable for standing purposes, where the plaintiff alleges exposure to potentially harmful products," *id.*, and those products pose a "credible threat of harm," *id.* at 637 (internal quotation marks omitted). Acknowledging that "this type of injury has been most commonly recognized in environmental cases," the *Baur* panel critically relied on two case-specific factors, neither of which is present here, to arrive at this holding. *Id.* at 634. First, "[l]ike threatened environmental harm, the potential harm from exposure to dangerous food products or drugs 'is by nature probabilistic,' yet an unreasonable exposure to risk may itself cause cognizable

future standing cases).

8

injury." *Id.* (quoting *Gaston Copper*, 204 F.3d at 160). Second, "the very purpose of [the statutes alleged to have been violated] is to ensure the safety of the nation's food supply and to minimize the risk to public health from potentially dangerous food and drug products," further bolstering the case for recognizing increased risk as a sufficiently concrete and imminent injury in fact in that specific context. *Id.*

The panel identified *no* such factors in this case, nor did it engage in any similar analysis in extending the applicability of these probabilistic harm cases, decided in highly specific factual circumstances, to a setting in which the plaintiffs assert, at most, a risk of being incidentally intercepted by foreign surveillance conducted by the United States. Instead, the panel opinion states baldly that a threatened injury may be "sufficiently probable to support standing," with the ultimate inquiry "qualitative, not quantitative." *Amnesty Int'l*, 638 F.3d at 137 (quoting *Baur*, 352 F.3d at 637) (internal quotation marks omitted). While recognizing that the standing inquiry is "highly case-specific," *id.* (quoting *Baur*, 352 F.3d at 637) (internal quotation marks omitted), the panel rests its conclusion that the future harm asserted here is "sufficiently probable" solely on the fact that the FAA is "susceptible to . . . an interpretation" whereby it authorizes broad surveillance, *id.* at 138, and that the plaintiffs are "reasonable" in their assessment that they communicate with people who are likely targets of surveillance under the Act, *id.* at 139. However, even if these assertions were sufficient to establish an enhanced risk of surveillance (and I share Judge Raggi's view that they are far too speculative to do so), the panel provides no justification for the more basic question of why such increased risk should be treated as injury in the first place.

Indeed, a careful and context-sensitive analysis of previous probabilistic harm cases would suggest that their logic should *not* be extended to challenges to surveillance that is not actual or

9

certainly impending, but instead only feared.  As Judge Raggi's dissent highlights, all the previous cases cited by the panel in which standing has been granted based on the risk of a future probabilistic injury have involved plaintiffs who had established that they were subject to the conduct they were challenging, with the only uncertainty being whether harm would ultimately result from the conduct in question.  *See* Raggi, J., Op. at 17-23; *see also Laidlaw*, 528 U.S. at 184 ("[I]t is undisputed that Laidlaw's unlawful conduct — discharging pollutants in excess of permit limits — was occurring at the time the complaint was filed. . . . [T]he only 'subjective' issue here is '[t]he reasonableness of [the] fear' that led the affiants to respond to that concededly ongoing conduct . . . ." (final two alterations in original)).  None involved uncertainty as to whether the plaintiffs were in fact subject to the challenged conduct in the first place, as is the case here.  Indeed, where the Supreme Court has confronted uncertainty of the latter type, it has denied standing even in the context of environmental harms.  *See Summers*, 129 S. Ct. at 1152 (rejecting organizational standing even though it was "possible — perhaps even likely" that a member of the plaintiff organization used an area of the National Forest System affected by a challenged activity but no member established that they did  in fact use an affected area).

In addition, unlike the environmental or health-related suits, the purported injury at issue here is not "inherently probabilistic" in the sense that it may simply be impossible, based on the limits of scientific capacity or human understanding, to know whether, for example, certain allegedly polluting activity to which would-be plaintiffs are clearly subject will in the future inflict harmful effects on them.  Here, the plaintiffs' communications either are or are not being intercepted.  The plaintiffs sought no discovery as to standing, despite the fact that it was their burden to show actual or imminently threatened harm.  To the extent plaintiffs cannot establish the

fact of surveillance either way, this is a product of: (1) the judgment of our coordinate branches (based no doubt on their own "realistic understanding of the world," *Amnesty Int'l*, 638 F.3d at 139) that foreign intelligence surveillance must be conducted in secrecy in order for it to be effective in safeguarding the national security; and (2) plaintiffs' own election not to seek discovery as to standing, and thereafter to overcome (if able) any objections to such discovery, including the application of the state secrets privilege, should it have been asserted. *See United States v. Aref*, 533 F.3d 72, 78-79 (2d Cir. 2008) ("Th[e] venerable [state secrets] evidentiary privilege 'allows the government to withhold information from discovery when disclosure would be inimical to national security.'" (quoting *Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544, 546 (2d Cir. 1991))). It is difficult for me to fathom how any of these circumstances justifies a relaxed standing burden for the plaintiffs here, and certainly, the panel opinion fails to offer any such justification by ignoring the context-sensitive nature of the "probabilistic harm" standing cases altogether.

* * *

The standing requirement is designed to "maintain[] the public's confidence in an unelected but restrained Federal Judiciary," *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011), limiting the judiciary "to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law," *Summers*, 129 S. Ct. at 1148. Applied faithfully, it prevents the installation of "the federal courts as virtually continuing monitors of the wisdom and soundness" of both legislative and executive action. *Laird v. Tatum*, 408 U.S. 1, 15 (1972). In determining when injury in fact has been established, "[a]lthough 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for

11

Article III purposes — that the injury is '*certainly* impending.'" *Lujan*, 504 U.S. at 564 n.2 (emphasis added by *Lujan*) (quoting *Whitmore*, 495 U.S. at 158) (internal quotation marks omitted). The breaking point has been reached in this case.

In light of the fact that these plaintiffs cannot demonstrate even a non-speculative increased risk of surveillance (among many other bases for denying standing here) the panel need not have decided whether an "objectively reasonable" threat of future surveillance was sufficient for Article III standing. Its conclusion nevertheless that such a risk does qualify as injury in fact, however, represents a truly dramatic and unjustified expansion of this Court's probabilistic harm cases to the inapposite context of government surveillance. By allowing a sweeping facial constitutional challenge to a statute that merely sets out the manner in which the executive branch can conduct certain types of foreign surveillance, based purely on a purported increased threat of surveillance and self-inflicted costs arising out of this asserted fear, the panel ignores the animating concerns of the standing requirement and threatens without justification to transform our existing doctrine regarding claims of future harm. It is a step without support in the case law of the Supreme Court or this Circuit, one contrary to the approaches taken in surveillance cases by our sister circuits, and one not in keeping with the limited role of the judiciary in our constitutional structure. I respectfully dissent from the denial of *en banc* review.

DENNIS JACOBS, <u>Chief Judge</u>, dissenting from the denial of rehearing <u>in</u> <u>banc</u>:

I concur in Judge Raggi's and Judge Livingston's scholarly dissents. I would also subscribe to Judge Koeltl's opinion dismissing this case for lack of standing. I write separately to make a few points of my own.

The panel opinion repeatedly emphasizes that its impact is on the threshold standing issue only and that it has no bearing on the merits. <u>See</u> <u>Amnesty Int'l USA v. Clapper</u>, 638 F.3d 118, 121, 131, 143 n.26, 145 (2d Cir. 2011). I take the opinion on those terms. The panel opinion does indeed avoid the merits. The panel's analysis of injury simply credits as sufficient certain averments by the plaintiffs that seem to me inadequate, implausible, and illusory. And the panel's analysis of redressability, which ordinarily requires a preliminary merits review (to determine if the court could ameliorate some palpable harm to the plaintiffs), is consigned to an uninformative footnote. It is therefore quite so that the panel opinion decides nothing about the merits--and thereby leaves the way clear for dismissal after remand at a stage just beyond the threshold of standing.

That said, I think that it is a defect in the panel opinion that it elides even the glancing review of the

merits that is needed to determine if the challenged statute impairs the Fourth Amendment rights of these plaintiffs, or if they suffer an injury that a court can alleviate.  That review, which I undertake here, refutes harm and redressability, and should therefore have defeated standing: These plaintiffs and their lawyers are claiming a policy-making role on matters that have no Fourth Amendment impact on them.

* * *

An assortment of lawyers, journalists and activists, and organizations representing such people, facially challenge the constitutionality of § 702 of the Foreign Intelligence Surveillance Act of 1978 ("FISA"), 50 U.S.C. § 1881a, which was added to FISA by § 101(a)(2) of the FISA Amendments Act of 2008 (the "FAA").

Their claim is that the FAA lowers the standards for obtaining warrants to surveil foreign persons abroad, which has caused the plaintiffs, who are *not* foreigners, to develop a reasonable fear of being surveilled when communicating with foreigners around the world who are their journalistic sources, clients, human rights victims, witnesses and so on--all of whom are, in plaintiffs'

2

estimation, potential objects of surveillance. The plaintiffs contend that this fear compels them to communicate with their clients or foreign contacts only in person, at such trouble and expense as to constitute injury that supports standing.

Three things are ordinarily required for constitutional standing: (1) injury in fact, (2) causality, and (3) redressability. If a plaintiff is not personally subject to the government action, the panel opinion identifies a fourth requirement: a "showing that [the plaintiff] has altered or ceased conduct as a reasonable response to the challenged statute." Clapper, 638 F.3d at 141 (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 184-85 (2000)). The plaintiffs show none of these.

\* \* \*

To support the otherwise-mysterious idea of injury to these plaintiffs (and causation), the panel opinion relies entirely (even credulously) on affidavits submitted by the plaintiffs, describing their supposed anxieties. But these affidavits employ all the lawyer's arts to convey a devious impression.

3

The panel opinion bases its finding of injury and causation entirely on the ethical duties of lawyers and the affidavits of the lawyer plaintiffs.[1]  So evidence about the non-lawyer plaintiffs (to the extent there is any that specifies an injury) is irrelevant here.  (For some reason, the panel's mandate nevertheless confers standing indiscriminately on *all* the plaintiffs, including the journalists and various other activists.)

Among the plaintiffs who submitted affidavits, only two are lawyers who represent clients.  Scott McKay, a lawyer for Guantanamo Bay detainees, does not specify a single trip he took or a single dollar he spent as a result of the FAA.  Instead, he just avers generally that he "minimize[s] the amount of sensitive information that [he] communicate[s] by

---

[1] The lawyers among the plaintiffs invoke an affidavit of Prof. Stephen Gillers, which contains a sound review of the ethical duties of lawyers:

> If an attorney has reason to believe that sensitive and confidential information related to the representation of a client and transmitted by telephone, fax, or e-mail is reasonably likely to be intercepted by others, he or she may not use that means of communication in exchanging or collecting the information.  He or she must find a safer mode of communication, if one is available, which may require communication in person.

Declaration of Prof. Stephen Gillers ¶ 10.

4

telephone or email" and that "[w]henever possible, [he] also collect[s] information in person rather than by telephone or email." Declaration of Scott McKay ¶ 8. Of course, that is what every good lawyer does--on every matter. Sylvia Royce, another lawyer representing a detainee, specifies only a single expense she attributes to the FAA: a trip to Manhattan (not Guantanamo). She avers:

> Where information is both especially important and especially sensitive, I have to travel to share information, views and ideas that I would otherwise have been able to exchange by telephone or e-mail. Most recently, I went to New York City to meet with [a French attorney] and another lawyer to talk about [my client's] case, but I also expect to travel abroad in the future to meet with co-counsel and I expect to exchange information in our meetings in person that I would not exchange by telephone or email.

Declaration of Sylvia Royce ¶ 7. Yet (as Judge Raggi points out) the FAA had nothing to do with her trip to New York to talk with co-counsel because a call between points inside the United States could not have been tapped under the FAA.

Even if one accepts the truth of these perfunctory affidavits (with their studied vagueness and anticipations of the conveniently unknown future), the declarations contained in them do not establish that either lawyer was injured or incurred expense that had any causal relation to

5

the FAA. Yet, these affidavits provide the *only* evidence to support the panel's ruling as to harm and causation.

* * *

The remaining standing issue, redressability, is consigned to a footnote in the panel opinion, a footnote that does not explain how a favorable decision in this case will redress plaintiffs' supposed injuries. <u>Clapper</u>, 638 F.3d at 140 n.24. Even if the record disclosed specific instances in which lawyers were injured by the FAA, plaintiffs would still lack standing for the reason identified by Judge Alice Batchelder in <u>ACLU v. NSA</u>, 493 F.3d 644 (6th Cir. 2007), an opinion that is not answered head-on by the panel opinion. Any lawyer whose ethical scruples would now prevent electronic contact with his foreign clients out of fear of surveillance would have had to incur the same bother and expense *before the FAA*, since the FISA Court has already approved thousands of warrants. <u>Id.</u> at 670-72. Thus, the plaintiffs (and the panel opinion) prove too little.

By the same token, the plaintiffs (and the panel opinion) prove too much. The ethical obligation discussed by Prof. Gillers (<u>see</u> <u>supra</u> note 1) has nothing to do with

whether the FAA is constitutional: what is "[d]eterminative of how the lawyer may proceed is," as Prof. Gillers explains, "whether the lawyer has good reason to believe that his or her communications are reasonably likely to be intercepted, *even if the interception is lawful*." See Clapper, 638 F.3d at 128 (quoting Gillers Decl. ¶ 11) (emphasis added). Thus, any burden imposed on plaintiffs by the risk of surveillance arose under the pre-FAA regime as well. And since (obviously) wiretap surveillance is authorized by statutes other than the FAA, it is by no means limited to foreigners abroad. So the inhibition that allegedly besets the plaintiffs would (if valid) affect all criminal defense lawyers--not to mention psychiatrists and the clergy--all the time.

The panel's redressability argument (following plaintiffs' affidavits) is also premised on the fanciful idea that, for a foreign person of interest abroad *in his own country*, the only risk of surveillance is surveillance *by the United States*--as though otherwise persons of interest in Iran, Syria, Bosnia, Sudan and Cuba (not to mention Russia or Spain) can chatter away confident that the security services of those countries (and others) are not

7

listening--as though those places have a Fourth Amendment to be begin with, and adhere to it more scrupulously than does the United States. The plaintiffs' affidavits thus betray their buried assumption that the United States is the only threat to liberty that anyone anywhere needs to worry about.

*   *   *

Finally, the FAA does not even bear upon the plaintiffs' Fourth Amendment rights because the FAA concerns only the surveillance of persons abroad who are not United States citizens or residents. The FAA implements this limitation through minimization (procedures for limiting the information received and retained by electronic surveillance) and targeting (procedures for limiting the persons and facilities to be surveilled), and the FISA Court is given power to review those procedures for compliance with the Fourth Amendment.[2] Since the FAA bars the

---

[2] Under the FAA, a surveillance order shall issue:

> If the Court finds that a certification submitted in accordance with subsection (g) contains all the required elements and that the targeting and minimization procedures adopted in accordance with subsections (d) [targeting] and (e) [minimization] are consistent with the requirements of those subsections *and with the fourth amendment to the Constitution of the United States*.

50 U.S.C. § 1881a(i)(3)(A) (emphasis added).

targeting of individuals in or of the United States, there can be nothing for the FISA Court to consider under the Fourth Amendment *but* those procedures.

And as to persons abroad, with whom the plaintiffs claim to be in communication: "the Fourth Amendment has no application" to the search of a person of foreign nationality, outside the United States, with "no voluntary attachment" to this country.  United States v. Verdugo-Urquidez, 494 U.S. 259, 274, 275 (1990); see also In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 157, 171 (2d Cir. 2008) (holding "that the Fourth Amendment's Warrant Clause has no extraterritorial application" to searches of United States citizens abroad).

In short, the FAA does not implicate any Fourth Amendment right of any plaintiff, or of any foreign person with whom any plaintiff may communicate.

* * *

Since these plaintiffs are not subject to the FAA, and since the Fourth Amendment has no application to their supposed clients, sources and communicants--who are foreign persons abroad--and since the only evidence they proffer of personal inconvenience and expense are affidavits that are

9

craftily worded to skirt actual falsehood, what is the interest in bringing this suit?

At the risk of being obvious, the purpose of this lawsuit is litigation for its own sake--for these lawyers to claim a role in policy-making for which they were not appointed or elected, for which they are not fitted by experience, and for which they are not accountable. As best I can see, the only purpose of this litigation is for counsel and plaintiffs to act out their fantasy of persecution, to validate their pretensions to policy expertise, to make themselves consequential rather than marginal, and to raise funds for self-sustaining litigation. In short, counsel's and plaintiffs' only perceptible interest is to carve out for themselves an influence over government policy--an interest that the law of standing forecloses.

For the foregoing reasons, I conclude that the plaintiffs suffered no injury, and certainly none that can be redressed by this Court. In part, that is a function of the frivolous nature of the claim. In that respect, it bears similarity to a <u>pro</u> <u>se</u> plaintiff's allegation that the CIA is controlling him through a radio embedded in his

molar.  But, as to the standing analysis, there is this difference:  The pro se plaintiff is actually suffering, is truly hoping for redress, and is not bringing suit as a pretext to weigh in on government policy.

PETER W. HALL, *Circuit Judge*, dissenting from the denial of rehearing *in banc*:

I respectfully dissent from the denial of rehearing *in banc* solely because I believe this case "involves a question of exceptional importance" warranting *in banc* review. Fed. R. App. P. 35(a)(2).